**MAYSON MFG. CO. v. COMMISSIONER OF INTERNAL REVENUE.**
No. 10878.

United States Court of Appeals
Sixth Circuit.
Nov. 17, 1949.

William C. Allee, Detroit, Mich., (William C. Allee, Detroit, Mich., Edward A. Smith, Detroit, Mich., on the brief), for petitioner.

Harry Marselli, Washington, D. C., (Theron Lamar Caudle, Ellis N. Slack, Fred E. Youngman, Washington, D. C., on the brief), for respondent.

Before HICKS, Chief Judge; SIMONS and MILLER Circuit Judges.

MILLER, Circuit Judge.

The petitioner, Mayson Manufacturing Company, seeks a review of the ruling of the Tax Court which sustained a deficiency assessment of the Commissioner of Internal Revenue in declared value excess-profits tax and excess-profits tax for the calendar year 1943 in the respective amounts of $2,460.40 and $31,899.14. The assessment was the result of disallowances by the Commissioner of a portion of the compensation paid to three officers of the petitioner as being unreasonable in amount. Since the question involved is factual, the evidence is reviewed in some detail.

Petitioner was organized under the laws of Michigan on July 1, 1929 by Frank L. Wurl, Edward M. May and Lynn L. Hosier. Its 800 shares of capital stock were owned as follows: Wurl 401 shares, May 300 shares, Hosier 79 shares and G. E. Hohner 20 shares. Petitioner's organizers became acquainted while employed by the Nizer Corporation of Detroit. Each had varied experience in their respective lines of work which proved to be of great benefit in petitioner's development.

Wurl provided most of the financial backing. His compensation is not involved in the present case. The compensation of May, Hosier and Otto Peterson are here under review.

May, who was the President and General Manager in 1943, began his career in 1914 when he was employed by the Ford Motor Company. He became foreman in the gear cutting department. He later worked for the American Car and Foundry Company and as a tool maker with several large concerns in Detroit, including Packard Motor Co., Dodge Bros., and Pontiac Motor Company. In 1921, he worked for the Chrysler Corporation as a checker and tool designer. He later engaged in experimental work in the refrigeration field for the Nizer Corporation, serving approximately 4½ years as head of the tool

designing department. He was later employed at the Kelray Laboratory which was also engaged in refrigeration experimentation, which employment he left when he helped to organize the petitioner.

Hosier, who was Secretary-Treasurer and sales manager of petitioner in 1943, had engaged in purchasing work for several corporations around Detroit and during 1927 became a sales representative on his own of forgings, castings, patterns and screw machine products. He had acquired many contacts in the refrigeration trade which later proved valuable in developing petitioner's business.

Wurl felt that the Company would prosper more if a bonus system was established. Accordingly, the Board of Directors at a meeting held on July 31, 1929, took appropriate action by which May, then Vice President, was appointed General Manager at a salary of $4,800 per year plus a bonus fund equal to 25% of the anual net profits for distribution by him among employees in his discretion. The compensation to Hosier was fixed at a commission of 5% of the gross value of the corporation's sales.

Petitioner's first work, obtained through the efforts of Hosier, was the repairing of some valves for Kelvinator Corporation. The business immediately prospered. In 1932, May developed and patented a refrigerator valve, using stellite material as its needle tip, which proved very successful until another concern in 1938 introduced a capillary tube which performed the same function at a much lower cost. In 1938, May designed a large expansion valve which was used in the steam heating of pullman car compartments. Petitioner also began the production of an expansion valve for use in commercial refrigerators, and a valve used as an oil burner control, both of which were designed and developed by May.

Otto Peterson, who was Vice President and Factory Superintendent in 1943, was asked to join the Company in 1932. He graduated from the Naval Academy in Copenhagen, Denmark, in 1905 with a degree in Marine Engineering, and then came to the United States in 1906, where he was first employed by the Ford Motor Company. He held responsible positions in several companies around Detroit and Cleveland in the capacity of a tool designer. While employed by Nizer Corporation he met May and Hosier who were very much impressed by his ability as a tool designer. When Peterson joined petitioner it was agreed that he would be paid a fixed salary and in addition receive a bonus of one-fourth of May's bonus fund of 25% of the net profits.

On January 15, 1930, the Directors fixed the basic salary of May at $1,000 per month and of Hosier at $300 per month for duties to be performed aside from sales effort. On January 24, 1933, the Directors fixed May's basic salary at $3,400 per month, Hosier's at $725 per month, and Peterson's, who then was not a Director, at $1,600 per month. These basic salaries were continued in force for 1934, 1935 and 1936. The basic salaries were reduced in 1937, and again reduced for the years 1938 through 1943. In December 1936, following conferences with the Internal Revenue Agent, the original basic salaries for 1934, 1935 and 1936 were retroactively reduced to the amounts established for the year 1937. The following tables show the basic salary, total compensation paid, and total compensation allowed by the Commissioner, to May, Peterson and Hosier respectively, for each of the years 1934 through the years 1943:

Edward M. May (President and General Manager)

| YEAR | BASIC SALARY | TOTAL COMPENSATION PAID | TOTAL COMPENSATION ALLOWED |
|---|---|---|---|
| 1934 | 40,800 | 55,596 | 44,796 |
| 1935 | 40,800 | 48,441 | 37,641 |
| 1936 | 30,000 | 60,342 | 60,342 |
| 1937 | 30,000 | 54,082 | 54,082 |
| 1938 | 24,000 | 24,000 | 24,000 |
| 1939 | 24,000 | 30,188 | 30,188 |
| 1940 | 24,000 | 29,409 | 29,409 |
| 1941 | 24,000 | 36,320 | 36,320 |
| 1942 | 24,000 | 51,662 | 47,139 |
| 1943 | 24,000 | 68,190 | 47,139 |

Otto Peterson (Vice President in Charge of Mfg.)

| YEAR | BASIC SALARY | TOTAL COMPEN- SATION PAID | TOTAL COMPEN- SATION ALLOWED |
|---|---|---|---|
| 1934 | 19,200 | 24,132 | 19,932 |
| 1935 | 19,200 | 21,147 | 16,947 |
| 1936 | 15,000 | 25,113 | 25,113 |
| 1937 | 15,000 | 23,027 | 23,027 |
| 1938 | 12,000 | 12,000 | 12,000 |
| 1939 | 12,000 | 14,063 | 14,063 |
| 1940 | 12,000 | 13,803 | 13,803 |
| 1941 | 12,000 | 16,106 | 16,106 |
| 1942 | 12,000 | 21,221 | 19,713 |
| 1943 | 12,000 | 26,730 | 19,713 |

Lynn L. Hosier (Secretary, Treasurer and Salesman)

| YEAR | BASIC SALARY | TOTAL COMPEN- SATION PAID | TOTAL COMPEN- SATION ALLOWED |
|---|---|---|---|
| 1934 | 8,700 | 19,610 | 18,410 |
| 1935 | 8,700 | 28,418 | 27,218 |
| 1936 | 7,500 | 32,438 | 32,438 |
| 1937 | 7,500 | 30,723 | 30,723 |
| 1938 | 6,000 | 14,616 | 14,616 |
| 1939 | 6,000 | 18,969 | 18,969 |
| 1940 | 6,000 | 18,545 | 18,545 |
| 1941 | 6,000 | 25,832 | 25,832 |
| 1942 | 6,000 | 32,239 | 30,989 |
| 1943 | 6,000 | 40,825 | 30,989 |

On October 18, 1932, after Peterson joined petitioner, the stock ownership of the Company was as follows:

| | |
|---|---|
| Wurl | 250 shares |
| May | 300 shares |
| Hosier | 100 shares |
| Peterson | 150 shares |

Wurl died on April 6, 1936. On December 12, 1936, following a redistribution of his stock and the issuance of a large number of new shares of stock, the stock ownership of the $10.00 par value stock was as follows: May owned 300 shares and his wife owned 900 shares; Peterson owned 150 shares and two daughters owned 225 each; Hosier owned 100 shares, his wife owned 200 shares, and two daughters owned 50 shares each.

Beginning in 1940 and through the taxable year in question, petitioner's sales increased materially. Orders arising out of war work were very material in 1941, 1942 and 1943. In 1942, the Norge Division of Borg-Warner Corporation consulted petitioner about manufacturing a valve for a hydraulic gun turret. May spent about a month's time in designing and developing such a valve, often working 14 hours a day, seven days a week. It was very successful. May also designed a hydraulic amplifier, a time-delay valve, and a micro-valve for various companies, which resulted in substantial income to petitioner during 1943. His duties increased substantially during the war; he worked overtime and took almost no time off.

Peterson's duties increased during 1942 and 1943. He was charged with the responsibility of seeing that all production in the shop was done properly and on time. In 1943, petitioner employed three shifts. In addition to the usual hours in day time work, he spent a few hours at the factory at night approximately three nights a week. During 1943, his work averaged from 10 to 14 hours a day, most of the time seven days a week, with week-ends out only occasionally.

Hosier's work increased materially during 1942 and 1943. During 1943, he had the problem of procuring material for the production of petitioner's goods, which entailed contacting Government officials on numerous occasions for the purpose of getting priorities as well as completing many Government forms and reports. The commercial sales during 1943 were the result of his contacts made in previous years. In addition, he successfully solicited war contracts from Bendix Corporation, King-Seely Corporation and Industrial Centerless Grinding Company. The Norge account was obtained by him for petitioner. He took little or no vacations.

Statistical data, showing gross sales, combined compensation of May, Peterson and Hosier, wages to other employees, net profits, and dividends paid for each of the years 1934 through 1943 is given in the Memorandum Findings of Fact of the Tax Court of November 17, 1948, to which reference is made. This shows, among other facts, that the Surplus and Capital of the com-

pany was $77,076 in 1934, declined to $31,096 in 1938 and thereafter rose steadily to $121,826 in 1943, after paying the compensation in controversy and the liberal dividends hereinafter referred to.

The single question for decision is whether, under the facts, the Tax Court erred in sustaining the Commissioner's partial disallowance of amounts claimed by the petitioner as deductions from its gross income for 1943 as compensation paid for the services of May, Peterson and Hosier. Section 23(a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1) (A), provides that in computing net income there shall be allowed as deductions "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *." Treasury Regulations 111, § 29.23(a)-8 provides: "Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered." The question of reasonableness is one of fact. The finding of the District Court will not be set aside unless clearly erroneous. Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A.

Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir., 32 F.2d 42, 45, 68 A.L.R. 696; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 172; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131 F.2d 712, 715. The situation must be considered as a whole with no single factor decisive.

In the present case, all of these factors, with the exception of one, support the reasonableness of the compensation paid to May, Peterson and Hosier. These three officers were experienced, highly qualified and able executives. Each one performed the duties in his respective field in a very successful manner, and during the year in question gave unlimited time and effort to meeting the increased duties and problems of the business. The Company was very successful under their joint management. The ratio of their total compensation to gross sales has been fairly consistent throughout the 10 years for which information was given. In 1942, it was approximately 21%, and in several of the other years 25% or more. In 1943, it was less than 20%. Total wages to other employees also materially increased during 1941, 1942 and 1943. Substantial profits were made in most of the 10 years referred to, after payment of taxes and expenses, including the compensation now under consideration. In 1943, such profits were approximately twice as much as they were in 1941, somewhat larger than they were in 1942, and the highest in any year of the 10-year period reviewed. A very liberal dividend policy has been followed. Extremely liberal dividends were paid before the depression year of 1938. In 1941, dividends were resumed at the rate of 40%. In 1942, the rate was increased to 200%, and in 1943, despite a material increase in taxes, dividends were again paid on a 200% basis. There is no close relation between the ratio of compensation of the

three officers to the total payroll and the ratio of stockholdings of each of the May, Peterson and Hosier families. For example, while the May family actually owned 54.5% of the total stock the compensation paid to May was only approximately 19.4% of the total payroll. A similar situation existed in the case of Peterson, whose compensation bore a ratio of approximately 7.6% of the total payroll, while the Peterson family owned approximately 27.3% of the stock. The ascending scale of prices and the increased cost of living in 1943 resulted in materially increased compensation throughout industry generally. Of particular importance is the fact that the compensation allowed by the Commissioner to May and Peterson for 1943 is less than was paid and allowed to each of these officers in the years 1936 and 1937, while the compensation allowed by the Commissioner to Hosier in 1943 is less than the amount paid and allowed to Hosier in 1936.

The Tax Court attributed petitioner's greatly increased sales in 1943 more to the fortuitous circumstances of a war economy than the individual abilities of the officers involved. This same contention was considered by us in Roth Office Equipment Co. v. Gallagher, 6 Cir., 172 F.2d 452, 456, where we held that this alone does not establish unreasonableness where war business has resulted in increased work and responsibility.

The ruling of the Tax Court was based in part upon its finding that the compensation, including the basic salary and bonus, paid to petitioner's officers in 1943 did not result from an arm's length transaction; nor was it in accordance with a plan which it had consistently followed. We are of the opinion that the evidence does not support this finding. A basic policy of compensation, containing the incentive principle, was established by the Board of Directors on July 31, 1929, immediately after the petitioner was organized. In addition to a basic salary, May was given a contract-bonus fund equal to 25% of the annual net profits, and Hosier was given a commission of 5% of the gross value of the corporation's sales.

When Peterson was employed in 1936 his compensation was placed on the basis of a salary plus one-fourth of the bonus fund being paid to May. This plan of salary plus contract-bonus or commission was continued without change from 1929 through 1943. The basic salaries have fluctuated since 1929. After reaching a high in 1934 and 1935 they have been twice reduced since that time. For the year 1943 the basic salary for each officer was the same as it was for each of the years 1938 through 1942, which apparently was not regarded by the Commissioner as unreasonable in such prior years. But the 25% bonus fund to May and Peterson, and the 5% commission to Hosier have remained unchanged since they were originally put into operation in 1929. The material increase in compensation in 1943 over 1941 and 1942 was due to the operation of this incentive principle established 14 years prior. The fact that compensation under a contract-bonus and commission basis is larger in a particular successful year than in the immediate preceding years does not make it unreasonable, where the incentive principle of compensation has been fairly entered into between the parties and has been in satisfactory operation over a period of years, and the profits of the business in that particular year are ample to pay such compensation without prejudice to the payment of reasonable dividends and the financial condition of the company. As we stated in Roth Office Equipment Co. v. Gallagher, supra, "If the principle of bonus compensation is to be recognized, it carries with it the payment of liberal compensation in good years and moderate compensation in lean years." See also Van Hooser & Co. v. Glenn, D.C., W.D.Ky., 50 F. Supp. 279, 284; Wm. S. Gray & Co. v. United States, 35 F.2d 968, 974, 68 Ct.Cl. 480.

In our opinion, the contract-bonus and commission plan adopted by the petitioner in 1929 was a good faith transaction fairly entered into between the parties, and a satisfactory method of fixing compensation. "The policy of agreeing to pay a percentage of the earnings before they are earned, or even a sum in the

nature of a bonus after they are earned, is based primarily upon sound business principles." Wm. S. Gray & Co. v. United States, supra. The bonus contract and commission rate were negotiated by Wurl, the majority stockholder, at the start of the corporate existence, in furtherance of a sound principle and incentive compensation. His individual financial interest was in opposition to unreasonable or excessive compensation. The terms of the contract were reasonable. Compare Wright-Bernet, Inc., v. Commissioner, 6 Cir., 172 F.2d 343, 345, on commission sales. The contract and the company's operation under it were approved and accepted by the Commissioner over a period of a number of years. The good faith feature of the contract is also demonstrated by the fact that in 1938 May and Peterson received nothing under the bonus provision and in 1939 and 1940 received very moderate amounts in comparison to their basic salaries. It is also to be noticed that when the contract of employment was made with Peterson in 1936 he was not a director. The contract does not lose its original good faith character because its automatic operation in later years under favorable business conditions returned materially higher compensation.

■ The Tax Court also relied upon the fact that the petitioner failed to introduce any evidence showing what compensation other companies engaged in the same type of work paid for comparable services during the year in question. Such evidence, if available would have a bearing upon the issue. However, it is only one of several factors to be considered. Although the record shows that there were other companies engaged in the same type of work during the year in question, it was not shown that the situations of the officer personnel were in any way comparable. On the contrary, there was testimony by Hosier that he knew of four or five other concerns that manufactured products similar to those made by the petitioner, but such concerns were larger than petitioner and were not very similar. The Commissioner offered no witness in contradiction to this testimony, nor any testimony of his own concerning compensation paid by other companies for comparable services. Other companies comparable in size may not have used the incentive system of compensation. Under the circumstances, we are of the opinion that the absence of such testimony, from both petitioner and respondent, has little bearing on the issue.

■ This is another case, similar to others referred to herein, where all the testimony before the Tax Court was on behalf of the petitioner. The Commissioner introduced no witness in his behalf. No witness testified that the compensation fixed by the Tax Court for each of the three officers was in fact reasonable compensation for the services rendered. We do not know from the record how those figures were arrived at. On the contrary, petitioner's testimony was that the compensation actually paid was reasonable compensation in each instance. No opportunity was afforded petitioner to cross-examine any witness who might have testified for the respondent to the contrary or to test the correctness or fairness of the figures selected by the respondent and the Tax Court. As was pointed out in T. P. Taylor & Co. v. Glenn, D.C., W.D.Ky., 62 F.Supp. 495, 499, "If the compensation received * * * was unreasonable for the services rendered, certainly the government could have produced some experienced witness * * * who would have said so. The lack of such evidence operates very strongly against the defendant's contention." The case presents a situation very similar to those considered and discussed by this Court in Capitol-Barg Dry Cleaning Co. v. Commissioner, supra; Wright-Bernet v. Commissioner, supra; Roth Office Equipment Co. v. Gallagher, supra. We recognize that in the present case petitioner's evidence on the issue was not from impartial witnesses. But, nevertheless, it was uncontradicted and was not referred to in the opinion of the Tax Court as being unworthy of belief. Under such circumstances, the failure of the Commissioner to introduce testimony supporting the deductions made by him lends considerable support to our view, gathered from other undisputed facts in the case, that the findings of the Tax Court

on the issues involved are clearly erroneous and should be set aside.

The case is remanded to the Tax Court with instructions to set aside the deficiency assessments complained of by the petitioner for the calendar year 1943.