Mahaska Bottling Company v. Commissioner.
Mahaska Bottling Co. v. Commissioner
Docket No. 86668.
United States Tax Court
T.C. Memo 1962-289; 1962 Tax Ct. Memo LEXIS 19; 21 T.C.M. (CCH) 1530; T.C.M. (RIA) 62289; December 7, 1962
Ned P. Gilbert, Esq., Sunstrum Bldg., Oskaloosa, Iowa, and Roy Stoddard, Jr., Esq., for the petitioner. David A. Pierce, Esq., for the respondent. MULRONEY Memorandum Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioner's income tax for the taxable years ended November 30, 1957 and November 30, 1958, in the respective amounts of $11,615.91 and $11,960. Petitioner took deductions for salary paid to its president in the amounts of $32,000 in 1957 and $35,000 in 1958, and also deductions for salary paid to its vice-president in the amount of $30,000 for each of said years. Respondent determined reasonable compensation for the services rendered *20 by petitioner's president did not exceed $24,000 for each of the two years in controversy and the reasonable compensation for services rendered by petitioner's vice-president did not exceed $15,000 for 1957 and $18,000 for 1958. The only issue is whether the amounts of salary paid to petitioner's president and vice-president were reasonable within the provisions of section 162(a)(1), Internal Revenue Code of 1954. Petitioner was organized in 1947 to engage in the business of bottling and merchandising soft drinks, principally Pepsi-Cola, in a 10 county area in southeastern Iowa. The business was originally a partnership between Arnold J. Muhl and his father-in-law, H. E. Morgan. During the years in question A. J. Muhl was president, his son John Muhl, vice-president and Zayda Muhl, wife of A. J. Muhl, was secretary-treasurer. A. J. Muhl was the majority stockholder. John Muhl owned a little less than 30 percent of the stock and Zayda owned 1.8 percent of the stock. Petitioner has the burden of proving the reasonableness of the salary paid to each officer. Geiger & Peters, Inc., 27 T.C. 911. The question is one of fact to be determined by all *21 of the facts and circumstances. Miller Mfg. Co. v. Commissioner, 149 F. 2d 421. Many opinions in this area have listed the relevant factors to be considered, not necessarily with equal importance, in arriving at a determination as to what is reasonable compensation for services. Both parties here have chosen the following statement in Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, as listing the basic factors to be considered: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers *22 the amount of compensation paid to the particular employee in previous years. * * * Some of the evidence in this case was stipulated and the evidence that was not was all produced by petitioner. It consists of the detailed testimony of several witnesses, including A. J. Muhl and John Muhl, the testimony of expert witnesses and the testimony of petitioner's auditor, together with documents, statistical data, maps, and charts and tables containing such financial data as yearly earnings, yearly net worth increases, and other tabulations of book data, from the date of petitioner's incorporation down through the years in question and sometimes to years beyond. The evidence is all designed to establish that petitioner is entitled to favorable consideration on all of the factors, which should be considered on the issue of reasonableness of the compensation it paid to its officers. We are spared the necessity of detailing some of the evidence for respondent states on brief his determination of salary allowances is based on giving petitioner favorable consideration as to some of the relevant factors. Respondent admits petitioner's two officers were well qualified for their jobs. The president, *23 A. J. Muhl, brought to his position the ability and training gained in over 40 years' experience in the soft drink bottling business. John A. Muhl, who was 37 years old at the time of trial, literally "grew up" in the business, starting with vacation jobs when he was in the sixth grade. He had served in all phases of petitioner's operations. Respondent states on brief that he does not "actively dispute" petitioner's contentions with respect to the factor of nature, extent, and scope of the two officers' duties. They worked 12 to 16 hours a day, six and sometimes seven days a week. The entire management of this business with around a million dollars in sales a year was vested in these two officers. They performed the duties of credit manager, advertising manager, personnel manager, vending machine manager, plant manager and sales manager, in addition to their duties as executives charged with the tasks of contributing ideas and making policy decisions. Respondent admits the officers were operating a more complex business than a manufacturing operation or a mere wholesale or retail operation. Petitioner's business encompassed a part of manufacturing, wholesale, and retail operation, *24 and its products were low priced, low profit items. But respondent argues it was no more complex than other businesses that supply markets with food, such as bakeries and dairies. This is true but the fact remains the business was complex and its ordinary operation generated numerous problems that had to be solved by its management team. The factor of petitioner's salary policy with respect to all of its employees is not very important here. Petitioner had no executive personnel other than the president and vice-president. It had about 100 employees during the years in question of whom about 65 could be classed as regular and the balance seasonal. With the exception of the plant foreman and a dozen or more driver salesmen (paid mostly on a commission basis), the employees would be classed as laborers, whose compensation would be dictated by the labor market. The plant foreman and the driver salesmen received rather regular increases in compensation over the years of petitioner's operation. The officers did receive a substantial increase in compensation beginning with the year 1957 over what they had received during prior years. The officers' salaries for years prior to the years *25 in question were as follows: Taxable Year
John Muhl
Arnold J. Muhl
Ended Nov. 30
Vice-President
President
1948
$ 5,800.00
$12,000
1949
6,494.48
9,000
1950
5,986.00
10,000
1951
6,212.77
10,000
1952
5,452.92
11,000
1953
9,000.00
13,000
1954
10,000.00
15,000
1955
11,000.00
16,000
1956
12,000.00
20,000
It is petitioner's position that they were underpaid by petitioner in each of the prior years and that they accepted underpayment in order to accumulate surplus and attain a strong financial position, to assure petitioner's future success and growth, and have available as much capital as possible to build a desperately needed new, properly equipped building. The goal of a new plant was achieved in 1961 when petitioner constructed its new building at a cost of around $440,000, and moved into it in September of that year. It is not unusual for the officers and principal stockholders of a corporation to take low salaries during the early years of the corporate existence. The large increase is in the salary allowed to John Muhl in 1957 but we think it is established that his salary for prior years was much too low for the amount and quality *26 of services performed. While the salary increases here are significant, we think they are adequately explained by the evidence of undercompensation in prior years. Petitioner's business is one of steady growth. Its sales increased from $868,017.93 in 1948, the first complete year of its operation, to $1,063,195.27 in 1958. During all of these years its operating costs, other than labor, have been held quite constant. Beginning with its third year of operation, 1950, its operation showed a net profit, after all taxes in each year ranging from $5,389 in 1950 to $41,689.84 in 1958. During these same years petitioner's net worth was increased by about $142,300. In 1958, for the first time, it sold over a half million cases, and its profit that year, after paying taxes and the salaries in question, was the highest in its corporate history. In each of the next two years its profits exceeded $50,000 annually. Out of 11 organizations bottling and selling Pepsi-Cola in Iowa, petitioner stands third as measured by bottles per capita of Pepsi-Cola sold. The regional manager of the Pepsi-Cola Company emphatically stated that petitioner's growth was "the result of its management." Respondent *27 stresses the failure of petitioner to introduce evidence of comparable salaries of officers in similar competitive businesses. When such proof can be obtained it is a highly pertinent factor to consider. Petitioner argues it was unable to locate any other executives rendering like services to like businesses under like circumstances. Such evidence is not helpful unless the positions and circumstances are similar. We feel the wealth of testimony in this case with respect to the other factors is sufficient to rebut the presumptive correctness of respondent's determination, and sustain the reasonableness of the salaries paid to the two officers during the years in question. It is worth noting such evidence of rates of compensation for comparable positions, in comparable concerns, would probably have been as readily available to respondent as to petitioner. Respondent offered no testimony in the case. We hold for petitioner. Decision will be entered for the petitioner.