**WEAVER AIRLINE PERSONNEL SCHOOL, INC., Plaintiff,**

v.

**Edwin O. BOOKWALTER, District Director of Internal Revenue, Defendant.**

No. 13123–3.

United States District Court
W. D. Missouri, W. D.

May 6, 1963.

Kenneth C. West, of Raymond, West & Cochrane, Kansas City, Mo., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Jerome Fink, Dale E. Anderson, Attys., Dept. of Justice, Washington, D. C., F. Russell Millin, U. S. Atty., by Calvin K. Hamilton, Asst. U. S. Atty., Kansas City, Mo., for defendant.

DUNCAN, District Judge.

This action was instituted by the plaintiff against the defendant under § 1346 (a) (1) Title 28 U.S.C.A. as amended, July 30, 1954, in accordance with the requirements of § 7422 Title 26 U.S.C.A. relative to actions for refunds of internal revenue taxes.

Plaintiff seeks to recover the sum of $74,816.31 together with interest thereon

at 6% per annum from May 20, 1960, which it alleges was erroneously assessed against it for the fiscal year 1957–58, ending June 30, 1958.

The controversy arises over the question of whether or not salaries paid by the plaintiff to its officer-stockholder-employees and deducted on its return, were reasonable compensation for services rendered, as provided under § 162(a) (1) I.R.C.1954 26 U.S.C.A. With the exception of the reasonableness of the amounts of such salaries, the facts are not in dispute.

Plaintiff is a Missouri corporation engaged in training young people in all branches of airline work, except technical-mechanical, and it has been highly successful in placing its students in the industry.

For a number of years prior to 1952, Howard S. Weaver and Howard V. Weaver (father and son respectively) were the owners and operators of the Weaver School of Real Estate, Inc., in Kansas City, Missouri. The business had been prosperous, but did not afford sufficient activity for Weaver, Jr., and he sought other fields of activity.

In November of 1952, the Midwest Schools, Inc., a corporation, operating in Kansas City, was on the threshold of financial failure, and pursuant to negotiations, the Weaver School of Real Estate, Inc., purchased certain selected assets of the Midwest Schools, Inc., for the sum of $2,030.00.

Following the purchase of this school, Weaver, Jr., began looking for someone to assist in the operation of the new school. After inquiry among persons familiar with those engaged in this type of work, he came in contact with L. C. Cagle, who had been associated with another school of a similar type and was recognized as an outstanding salesman in the school business.

On February 18, 1953, an agreement was entered into between the Weaver School of Real Estate, Inc., Weaver, Sr., and Claudia A. Weaver, Weaver, Jr., and Nadine M. Weaver, all of Kansas City, Missouri, who were stockholders of the Weaver School of Real Estate, Inc., and L. C. Cagle, who at that time was a resident of Pennsylvania.

Under the terms of this agreement, it was provided that a new corporation would be organized under the name of Weaver Airline Personnel School, Inc., the stock of which was to be owned by the principal stockholders of the Weaver School of Real Estate, Inc. It was agreed that Cagle should, at his own expense and by his own methods, formulate and direct a sales program for the solicitation and enrollment of students in the said Weaver Airline Personnel School, Inc., and that he should devote his full time to such work for a period of five years from the date of said contract.

It was further agreed that Cagle was to be paid the sum of "10% of all cash business originating from contracts and enrollment in said Weaver Airline Personnel School, or its successors, payments to be made monthly as collections are received on said business."

It was further agreed that Cagle should also be paid a regular salesman's commission on all contracts obtained by him in addition to the 10% provided above, and further that "Howard S. Weaver, Claudia A. Weaver, Howard V. Weaver, Nadine M. Weaver as incorporators of the new company, grant to L. C. Cagle an option to purchase at par at any time within five years from the date of incorporation of such new company, 50% of the capital stock of said company to be paid for either with private funds or with the earnings from the stock."

There were certain restrictions upon such stock. However, Cagle was to become a member of the Board of Directors and have an equal vote in all transactions of the new corporation if and when he had purchased the 50% of said stock. Later this agreement was modified to permit Cagle to purchase 33⅓% of the stock.

This contract provided that it should not be revoked or terminated during said five year period, except by mutual consent at any time. It was renewable up-

on the same terms and conditions as far as practicable, for a similar period of five years, unless one party notified the other in writing at least six months before the termination of any five years of his or its desire to terminate the agreement.

At the first meeting of the Board of Directors on June 30, 1953, Weaver, Sr., was named Chairman of the Board and Nadine M. Weaver as secretary. Then the following were elected officers of the corporation, Weaver, Jr., President; Weaver, Sr., first vice-president; L. C. Cagle, second vice-president, Nadine M. Weaver, secretary and Weaver, Jr., treasurer.

At this meeting the Board adopted and ratified the contract entered into between the Weaver School of Real Estate, Inc., and L. C. Cagle, and the Weaver School of Real Estate, Inc., was released from any and all responsibilities under the terms of said contract.

A resolution was also adopted providing that "Howard V. Weaver, as executive officer of the company should receive 10% of the gross of all tuitions received until further order of the Board of Directors". This order was not changed and during all of the years of plaintiff's corporate

existence that resolution with respect to Weaver Jr.'s compensation remained in full force and effect.

On June 29, 1955, it was determined by the Board of Directors that the company's growth required additional advisory staff, and pursuant to a resolution, Weaver, Sr., was employed in an advisory capacity to be compensated by the receipt of 2% of the gross receipts as full compensation for his services. It was under the terms of this agreement that he subsequently received the compensation which is a part of the controversy here.

Almost from the beginning the company, starting from practically nothing, enjoyed a phenomenal success. Year after year without exception its receipts grew in almost astronomical proportions.

| Year | Total Revenue Per Adjusted Return |
|---|---|
| 1954 | $ 231,390.15 |
| 1955 | 493,719.22 |
| 1956 | 649,048.56 |
| 1957 | 803,936.64 |
| 1958 [year in issue] | 1,075,969.20 |

The salaries of the three individuals also increased over this period.

| Year | H. V. Weaver | L. C. Cagle | H. S. Weaver | Total officer's compensation | Percent of Revenue |
|---|---|---|---|---|---|
| 1954 | $ 1,000.00 | $23,563.85 | .......... | $ 24,563.85 | 10.6 |
| 1955 | 43,232.62 | 35,079.92 | 2,700.27 | 81,012.81 | 16.4 |
| 1956 | 54,101.64 | 54,101.64 | 12,017.84 | 120,221.12 | 18.4 |
| 1957 | 67,521.59 | 68,598.27 | 15,004.80 | 151,124.66 | 18.8 |
| 1958 | 92,287.72 | 92,903.97 | 20,508.39 | 205,700.08 | 19.3 |

Average for five years .....17.9

It will be seen that Weaver, Jr., was compensated in 1955 for the amount earned and credited to his account in 1954.

For the fiscal year ending June 30, 1958, the defendant disallowed as deductions, the portion of the amounts paid which exceeded $35,000.00 for Weaver, Jr., and L. C. Cagle, and $5,000.00 for

Weaver, Sr. The difference between the amount paid to the three officers and that allowed by the defendant is $130,708.08. The plaintiff paid tax and interest on this amount under protest.

During the year in controversy, Weaver, Jr., was President, L. C. Cagle was Vice-president and sale director, and

Weaver, Sr., was Vice-president and general advisor, and each of the three owned 33⅓% of the plaintiff's corporate stock.

That year the plaintiff showed a profit on its return of $83,255.14 upon which it paid a tax of $37,792.67. The school had an enrollment of 5684 (home study) and 1060 (residence school).

During the five year period the capital of the corporation had never exceeded $15,000.00, and in the fiscal year ending June 1958, the Net Value of Fixed Assets was $37,366.38 and the Capital & Surplus after Taxes had grown to $95,-290.87 from $7,655.05 in fiscal 1954. Plaintiff has never paid a dividend.

The deductions taken by plaintiff for officers compensation in the three fiscal years immediately preceding the year we are considering at bar were also contested by the defendant. On June 29, 1959, after two years of controversy, the salaries for the three years were approved in full as paid, by the defendant's appellate division. The amounts approved were computed and paid under the same compensation plan (the agreement and resolution) as the salaries in controversy here.

Within ten days of the approval of the settlement in the appellate division, the defendant objected to the plaintiff's deduction for officers salaries on its return for fiscal 1958, and the total allowable compensation was set at $75,000.00 for the three principal officers.

Thereafter on August 3, 1959, the plaintiff filed Form 2553 and elected to come under the Technical Amendment Act of 1958, § 64(a) Election as to Taxable Status, subchapter S—Election of Certain Small Business Corporations as to Taxable Status, 1958 U.S.Code Cong. and Adm.News p. 1980, legislative history p. 4876; 26 U.S.C.A. §§ 1371–1377. This subchapter permits small business corporations, who qualify, to elect to be taxed, in effect, as partnerships. Under such an election the reasonableness of salaries paid to stockholders is not an issue.

In defense of this action the defendant contends that the compensation paid to Plaintiff's officers, in view of all the facts and circumstances in connection with their responsibility in the conduct of the business, was unreasonable and resulted in the loss of revenue to the Government, which would have been derived from the assessment of corporate income taxes against gross profits of plaintiff, and also against the distributive shares of the officers, all of whom were stockholders.

The plaintiff produced as its expert witnesses on the issue of reasonableness, a vice-president of one of the largest banks in Kansas City, the head of a school in Tulsa, Oklahoma, and two certified public accountants who testified that under all the circumstances in connection with the conduct of the business, that the compensation claimed by the parties was not unreasonable. Both Weaver, Jr., and Cagle testified that each thought the salary paid to the other was reasonable, but this is self-serving and entitled to little weight.

On the contrary, the defendant introduced the testimony of two witnesses, both of whom were heads of schools in Kansas City, one of whom testified positively that in his opinion the amounts were unreasonable. The other, on cross examination in answer to a hypothetical question, said that in her opinion the amount of compensation was not unreasonable, although in her own school during a like period, which was more nearly comparable to the plaintiff's school than any other for the year in controversy, the officers drew substantially less than the officers of the school in controversy here. However, her testimony also revealed that the officers of her school did not spend their full time at their jobs as plaintiff's officers did.

The testimony reveals that all sales representatives without exception, employed by schools of this type are employed on strictly commission basis, that they will not accept employment on any other basis. The evidence also reveals that substantial income is derived from their efforts, amounting in some cases to as much as $40,000.00 a year. That was the situation with respect to Cagle, and he

would not accept employment on any except a commission basis.

It is defendant's contention that although Cagle's connection with the business initially was that of sales promotional representative, he became in fact an executive whose duties were substantially greater than the direction of the sales organization.

With respect to the services performed by Weaver, Jr., and Cagle, the evidence reveals that both individuals spent long and hard hours at the plaintiff's business. They trained the members of the sales, teaching and administrative staffs. They personally handled all of plaintiff's advertising program, which amounted to about $100,000.00 per year, in order to save the agency commission. Cagle spent 100% of his working time in the business and Weaver, Jr. spent 90%, devoting the remainder to the Real Estate School. They worked nights and week ends and took no vacations. The evidence in this respect is uncontradicted.

The business of plaintiff was a joint operation with no strict lines of responsibility or authority and all three officers participated in the major administrative decisions.

The question for determination by the court here, it appears, is more that of approval or rejection of the plan for compensation and its reasonableness rather than the amount of compensation which the parties have received.

It may be conceded at the outset that the nature of the business is such that more than nominal working capital is not required, its only expense, after the acquisition of the physical properties, is that of teaching and sales.

The capital investment was quite small when compared to the gross and a large return in the form of profits or dividends to investors was not to be expected. It may be further conceded that the withdrawal of the substantial salaries has in no wise affected the efficiency of the school.

 The question of whether or not the salaries are excessive is strictly one of fact. Builders Steel Co. v. Commissioner of Internal Revenue, 197 F.2d 263, (8 Cir. 1952), Baltimore Dairy Lunch, Inc. v. United States, 231 F.2d 870 (8 Cir. 1956). The questions to be considered in determining whether or not they are unreasonable are:

(1) whether or not the payment is disproportionate to the value of the services;

(2) whether or not they are disproportionate to the income of the taxpayer and exhaust the earnings;

(3) whether or not dividends are paid;

(4) whether or not the payments are contingent upon the earnings to the taxpayer;

(5) whether or not the payments are determined before or after profits are determined;

(6) whether or not the payments fluctuate substantially with the rise and fall of earnings.

The principal consideration is the nature and extent of the services rendered to the taxpayer by the stockholder employee, but each case must be decided on its own facts. See generally Zimet & Diamond Revision of Mertens Law of Federal Income Taxation Callaghan & Co. § 25.61 to 25.88, and Mayson Mfg. Co., v. Commissioner of Internal Revenue, 178 F.2d 115 (6 Cir. 1949).

 Considering the tests set out above in order, the evidence is clear that the success of the school was largely due to the efforts of Weaver, Jr., and Cagle. The amount of salary paid to be sure was substantial, but so were the services rendered. I cannot say that they are disproportionate. The services which the two officers performed made the business pay and contributed to its success to a much greater degree than did the capital invested. This is a service business and its success depends to a large measure upon the individuals who operate it. The expert testimony on the issue of reasonableness preponderates substantially in favor of the plaintiff.

The ratio of the salaries to the gross in the year in question, as heretofore stated, was 19.3%, and there were in excess of $45,000.00 profits after taxes. The plaintiff has never in its history paid a dividend, but as indicated above, the profit after taxes in the year in question was sufficient to allow a substantial dividend had the stockholders desired to declare one.

The payments here were contingent and based upon a percentage of the gross. However, contingent compensation is not per se unreasonable and no single factor is decisive as the situation must be considered as a whole. Mayson, supra.

At the time of the acquisition of the meagre assets of the Midwest School, Inc., by Weaver School of Real Estate, Inc., and the germination of the idea for the establishment and development of the Weaver Airline Personnel School, Inc., it was not contemplated that the business would be as prosperous as it proved to be.

The contract for employment of Cagle with the Weaver School of Real Estate, Inc., was entered into and the percentage compensation plan established before the present plaintiff was incorporated.

Subsequently at plaintiff's first board of directors meeting Cagle's contract was ratified and assumed, and the board passed a resolution providing percentage compensation for H. V. Weaver equal to that specified in Cagle's contract. At this time there was no school, no profits, and the future of the enterprise was uncertain.

It is therefore clear from all the facts that the parties at that time did not have in mind draining off the profits by the payment of salaries for the purpose of avoiding distribution of dividends to stockholders.

I think to evaluate the legal situation, we must assume a somewhat different situation with respect to Cagle than that of Weaver. Cagle began his employment with plaintiff under the terms of a contract to run for five years, and no question has been raised as to its validity. It was a valid enforceable contract.

However, defendant seems to contend that despite the validity of the contract, that Cagle's position as an executive of the company places him in no different position than that of any other employee in the matter of limiting him to reasonable compensation for income tax purposes.

While I agree with the defendant's contention generally in that respect, certainly the existence of the contract is persuasive as to the reasonableness of Cagle's compensation insofar as the corporation is concerned. It is required to pay him that amount for his services rendered to the company, for which the company ought to be given credit in determining its net income.

The evidence reveals that in fixing Weaver's compensation, it was determined by the Board that in view of the fact that Weaver had organized the company and was to be its president and chief executive officer, that his compensation should be equal to that of Cagle, who was originally intended to be the sales promotional director. At any rate, the method of compensation was determined and settled upon before the corporation had any income at all.

During the first year of plaintiff's operation, there was not sufficient cash available for Weaver to be compensated on a basis of 10% of the gross. He therefore received only $1,000.00, and an additional amount to make his salary equal that received by Cagle was set up on the books of the company. Weaver, Jr., drew it out the next year when cash was sufficient to meet the deferred obligation.

So, it may be said that the plan here is not violative of the fifth test we have mentioned above, i. e., whether or not payments are determined before or after profits are determined. The arrangements admittedly were before.

There was little substantial fluctuation of payments, at least in the percentages between the rise and fall of earnings as it was shown that beginning with the fiscal year 1955, the second year of operation, there was only a difference of 2.9% —from 16.4 to 19.3%

A very similar question was before the Tax Court in Ziegler Steel Service Corp. v. Commissioner, decided March 16, 1962. In that case Ziegler had received substantially more percentage-wise under an agreement for compensation on a percentage basis than the parties to this controversy. Ziegler was to receive 20% of the net profits of the corporation before computation or reserve for federal income taxes and state franchise taxes, with a minimum monthly payment of $1,-000.00. Ziegler was the active business head and devoted his full time and attention to it, just as the parties to this controversy did. The Court cited Treasury

"Regulations 118 Sec. 39.26(a)–6 Compensation for personal services.

"(a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

"(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows:

"(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of *contingent* compensation invites scrutiny as a possible distribution of earnings of the ènterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate.

"Generally speaking, *if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of* *the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.* (Emphasis supplied.)

"(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amounts as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned."

It certainly cannot be contended that the parties here contemplated, at the time when the compensation plan was set up, that the business would develop to the extent it had when the compensation was questioned. In deciding the issues in favor of the taxpayer, the Tax Court stated:

"It is our conclusion, therefore, that, while the amount of compensation which Ziegler received in 1956 and 1957 was large, it was paid in accordance with an agreement entered into prior to the years in controversy and in arm's-length negotiations. The rate of compensation appears to reflect Glendale's opinion of Ziegler's worth. We find no reason to override this conclusion * * Nothing in the evidence indicates that the rate of compensation was fixed with an eye to the distribution of earnings. Furthermore, it appears that, by any test, Ziegler's contribution to petitioner's success is unquestionable. The amount of his compensation merely reflects that success, since it was based on net profits and was fixed by percentage prior to the years in question. Ziegler formulated and was largely re-

sponsible for the successful operation of petitioner. As we said in finding reasonable a salary paid in the early case of H. V. Greene Co. (Dec. 1900), 5 B.T.A. 442, 455: * * *."

In view of the efforts of the two principal officers of the corporation, their substantial contribution to its success, the arms' length nature of the compensation plan which was negotiated between strangers, particularly with respect to Cagle, prior to the year in question and before profits were known, the preponderance of the expert testimony, the nature of the business, and considering the officers and the salaries paid individually, I cannot say that the compensation paid was unreasonable.

The plaintiff has sustained its burden of proof as to reaonableness. It cannot be said under all the evidence that the plan of compensation was conceived by the parties for the purpose of drawing out the profits in the form of salaries rather than by distribution as dividends to the stockholders.

At a meeting of the Board of Directors on June 25, 1955, the company's growth was discussed, and it was determined that some additional advisory staff was needed. Howard S. Weaver, the father, advised that he was available for consultation, advisory meetings and other advisory services. It was determined by resolution that by reason of his years of experience, he could render much service in connection with the hiring, controlling and supervising of salesmen, and it was agreed that he should be employed in an advisory capacity as well as to supervise salesmen and other employees, and that he should receive as full compensation, 2% of the gross receipts.

It will be recalled that the purpose of bringing Cagle into the picture initially was because of his sales experience and the building of a sales organization, and that in keeping with the method of employing sales promotional managers, he would accept compensation on no other basis than that of percentage. Yet we now find that Weaver, Sr., whose primary interest and business was the Weaver Real Estate School, Inc., is being employed in an advisory capacity and also to hire and train salesmen.

It may also be recalled that Weaver, Sr., was the owner of ⅓ of the stock, and that there had been no declaration of dividend, thus he was receiving nothing for his interest in the company. He had invested an amount not in excess of $5,000.00 as his part of the initial capital stock.

Under the circumstances, it is difficult to escape the conclusion that realizing the company not only was a going business, but a very profitable one, and that he should "get his cut".

Cagle was devoting all of his time to the business (it is suggested 7 days a week), and Weaver, Jr., was devoting 90% of an equal amount of time, whereas the same record reveals that Weaver, Sr., devoted about 10% of his time to the business.

■ During the fiscal year with which we are concerned here, Cagle received $92,903.97; Weaver, Jr., received $92,287.72, and Weaver, Sr. under his 2% arrangement, received $20,508.39. Thus Weaver, Sr., for 10% of his time devoted to the business received in excess of 22% of the amount received by Cagle and Weaver, Jr. This is hardly consistent, it seems to me, with the alleged reasonableness of the compensation paid to him, particularly in view of the fact that provision for it was not made until two years after the business was organized, and at a time when its success was assured.

The Director reduced Howard S. Weaver's salary from $20,508.39 to $5,000.00. Keeping it on the same basis so far as time devoted to the affairs of the business is concerned, he would have earned $10,000.00. It would seem that that would be a very reasonable compensation for the amount of time he devoted to the business.

It is therefore my finding and conclusion that the salaries as paid to Weaver, Jr., and Cagle were reasonable and further that so much of the salary as paid to Weaver, Sr., as exceeds $10,000.00 was unreasonable.

Plaintiff was therefore entitled to take as a deduction on its return, the full amounts as paid to Weaver, Jr., and Cagle, and $10,000.00 of the amount paid to Weaver, Sr., and is entitled to judgment in accordance herewith.

Plaintiff is also entitled to interest on the judgment at the rate of 6% per annum from May 20, 1960.