Pacific Grains, Inc., an Oregon Corporation v. Commissioner.
Pacific Grains, Inc. v. Commissioner
Docket No. 4775-65.
United States Tax Court
T.C. Memo 1967-7; 1967 Tax Ct. Memo LEXIS 254; 26 T.C.M. (CCH) 46; T.C.M. (RIA) 67007; January 13, 1967
William H. Kinsey, 12th Flr., Standard Bldg., Portland, Ore., for the petitioner. Gary C. Randall, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal years ended January 31, 1963 and 1964 in the respective amounts of $5,850 and $12,408.06. The only issue is whether the amounts of salary paid to Robert R. Rodgers, petitioner's principal officer, in the fiscal years ended January 31, 1963 and 1964 were reasonable compensation within the meaning of section 162 of the 1954 I.R.C.[1]
*255 Findings of Fact Some of the facts were stipulated and they are so found. Petitioner, Pacific Grains, Inc., was organized under the laws of Oregon on February 19, 1955, and its principal office is in Rickreall, Oregon. Petitioner filed its Federal income tax returns for the fiscal years ended January 31, 1963 and 1964 with the district director of internal revenue, Portland, Oregon. Robert R. Rodgers presently owns all of the petitioner's outstanding shares of common stock (2,000 shares). During the years here involved the petitioner was engaged in the business of purchase, sale, storage, distribution and brokerage of grain and grass seed. Robert R. Rodgers came to Oregon in 1946 at the age of 26. In 1952, he became manager of Derry Warehouse Co., a grain elevator company near Rickreall and served as manager during 1952, 1953 and 1954. He did not own stock in the Derry Warehouse Co. He left this employment, and, together with one Wayne R. Giesy (who had also been employed by the Derry Warehouse Co.), formed the petitioner corporation in February 1955, with Rodgers serving as president and treasurer and Giesy serving as vice-president. Petitioner's principal asset originally *256 was a grain elevator with a capacity of approximately 300,000 bushels. Later in 1955, petitioner built another grain elevator at Suver, Oregon, with a capacity of 50,000 bushels and in 1960 petitioner leased a grain elevator at Dallas, Oregon, with a capacity of 50,000 bushels. In February 1959 Giesy sold his stock in petitioner to Rodgers who agreed to assume all of the liabilities which had been incurred by the parties in their venture. Rodgers then took over the duties previously performed by Giesy. In 1961, the Federal Government initiated the soil bank and diversified feed-grain programs and as a result the production acreage in this area was reduced. To offset the loss of grain storage income, petitioner became active in trading grass seed on a worldwide basis. Petitioner's overall investment in grain storage facilities in 1963 and 1964 was approximately $260,000 and $340,000, respectively. Petitioner's total sales for the fiscal years ending January 31, 1962 through 1964, were $1,709,364.73, $1,724,318.86 and $2,289,001.45, respectively. During the years here involved petitioner's income from grain storage and cleaning represented approximately 15 percent of its gross income *257 and the remaining 85 percent was earned through its brokerage operations. During the years here involved Robert R. Rodgers was president and treasurer of the petitioner corporation, Thelma M. Rodgers was the secretary, and one William H. Kinsey was assistant secretary. The same three individuals also served as the directors of the corporation during this period. Petitioner paid a base salary of $25,200 to Robert R. Rodgers in each of the fiscal years ending January 31, 1963 and 1964. At a special meeting of petitioner's board of directors held on December 28, 1962, a bonus payment to Robert was authorized for the fiscal year ending January 31, 1963 in an amount not less than $15,000 nor more than $20,000. At a special meeting of the board of directors held on December 27, 1963, a bonus payment to Robert was authorized for the fiscal year ending January 31, 1964, in the amount of $30,000. The following schedule shows petitioner's taxable income and the base salary and bonus payments made to Robert in the fiscal years ended January 31, 1960 through 1964: Fiscal Year
Corporate Tax-
Base
Ending 1/31
able Income
Salary
Bonus
Total
1960
$ 3,642.79
$12,000
$10,000
$22,000
1961
(16,838.48)
22,000
None
22,000
1962
24,681.67
24,000
5,000
29,000
1963
26,362.78
25,200
16,050
41,250
1964
34,630.25
25,200
30,000
55,200
*258 Petitioner's other principal employees (on the basis of salary) received the following compensation in the fiscal years ended January 31, 1963 and 1964: F/Y 1/31/63
F/Y 1/31/64
Name
Wages
Bonus
Wages
Bonus
Neil Evenson
$9,828.75
$2,500
$14,828.75
$5,000
Joel Miller
5,952.45
500
6,452.45
1,000
J. D. Montgomery
500
1,000
The balance sheets included in petitioner's Federal income tax returns for its fiscal years ended January 31, 1963 and 1964 indicate an earned surplus and undivided profits as of January 31, 1963 and 1964 in the respective amounts of $75,730.26 and $99,904.91. No dividends have been paid by petitioner since its organization. Petitioner claimed a deduction for compensation paid to Rodgers in the total amount of $41,250 for the fiscal year ended January 31, 1963 and in the total amount of $55,200 for the fiscal year ended January 31, 1964. Respondent in his statutory notice of deficiency disallowed the amount claimed by petitioner as a deduction for compensation to Rodgers in excess of $30,000 in each of the fiscal years ended January 31, 1963 and 1964. Opinion Section 162(a)(1) provides that "a reasonable *259 allowance for salaries or other compensation for personal services actually rendered" may be deducted as a business expense. Petitioner has the burden of proving the reasonableness of the compensation paid to Rodgers. The question is one of fact. Geiger & Peters, Inc., 27 T.C. 911. Some of the factors to be considered, not necessarily with equal importance, in reaching a determination as to what is reasonable compensation for services are the nature and scope of the employee's work; the size and complexities of the business; a comparison of the compensation paid with gross income and net income; the prevailing general economic conditions; comparison of the compensation with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years. See Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949). Rodgers was the sole stockholder and the dominant officer of the petitioner corporation. During the *260 years here involved, 85 percent of petitioner's gross income came from its brokerage function. Petitioner's trading in grass seed was on a worldwide basis and was highly speculative, requiring a sound judgment of market conditions and a thorough familiarity with weather and crop conditions throughout the world. Rodgers testified that he was a full-time employee of petitioner, working about 12 hours a day, primarily because of the time differentials throughout the world. Rodgers also testified that his trading operations were carried on mainly by telephone. Petitioner became active in trading operations in 1961, when Federal programs curtailed crop acreages in this area. Rodgers was paid total compensation of $22,000 in petitioner's fiscal years endingjanuary 31, 1960 and 1961. In the fiscal year ended January 31, 1962, Rodgers was paid a salary of $24,000 and a bonus of $5,000, or a total compensation of $29,000. In the fiscal year ended January 31, 1963, he was paid a salary of $25,200 and a bonus of $16,050, or a total compensation of $41,250, and in the fiscal year ended January 31, 1964, his total compensation climbed to $55,200 (salary $25,200 and bonus $30,000). These dramatic *261 jumps in total compensation, when compared with the total compensation paid to Rodgers in the fiscal year ended January 31, 1962, represent increases of approximately 40 percent and 90 percent in the fiscal years ended January 31, 1963 and 1964, respectively. There is no satisfactory evidence to show that such increases were justified by increased duties and responsibilities on the part of Rodgers during the fiscal years ended January 31, 1963 and 1964. As far as we can tell, the nature of Rodger's activities continued essentially unchanged from the fiscal year ended January 31, 1962, when his combined salary and bonus was $29,000. Significantly, the bonus payments to Rodgers for the fiscal years ended January 31, 1963 and 1964 were in each instance voted at special board of directors' meetings held a few weeks before the close of the fiscal year, presumably when the financial results of the fiscal year's operations could be approximated. We note also that, while petitioner's earned surplus climbed steadily from $62,406.98 as of January 31, 1962, to $99,904.91 as of January 31, 1964, petitioner has never made any dividend payments. In the fiscal year ended January 31, 1962, when *262 petitioner's corporate taxable income was $24,681.67, the total compensation paid to Rodgers was $29,000. In the fiscal years ended January 31, 1963 and 1964, when petitioner's corporate taxable income was $26,362.78 and $34,630.25, respectively, the total compensation paid to Rodgers was $41,250 and $55,200, respectively. Thus, the compensation was not only considerably increased over the prior fiscal year ending January 31, 1962 but also constituted a significantly greater propertion of petitioner's net income before salaries than in the prior year. Viewed against this background, it would appear that some portion of the total payments made to Rodgers in the fiscal years ended January 31, 1963 and 1964 was intended as a distribution of earnings rather than compensation for services currently rendered. Petitioner contends that the compensation paid to Rodgers in the fiscal years ended January 31, 1963 and 1964 was partly compensation for past services in prior fiscal years when his salary was unreasonably low. There is no factual basis in the record to support this contention. Petitioner calls our attention to the annual salary of more than $26,000 paid to Rodgers by his former *263 employer (Derry Warehouse) during the three years prior to the formation of the petitioner corporation as some indication that Rodgers was somehow underpaid by petitioner. Whatever relevance this might have, we give it little weight here because it does not appear that the services and duties rendered by Rodgers to his former employer were in any way comparable to his services to petitioner during the fiscal years here involved. [2] Finally, there is nothing in the minutes of the special board of directors' meetings which voted the year-end bonuses for Rodgers to indicate that such bonuses were intended as compensation for services rendered by him in prior years. We have considered the testimony of petitioner's witnesses as to compensation paid for comparable services in comparable businesses. We are not bound by the valuation opinions of these witnesses, even though uncontradicted. Golden Construction Co. v. Commissioner, 228 F. 2d 637 (C.A. 10, 1955), affirming a Memorandum *264 Opinion of this Court. Moreover, much of this testimony consisted of conclusions which were of limited assistance to this Court. At any rate, in the light of the facts of record, this testimony did not prove helpful in determining the reasonableness of the compensation paid to Rodgers during the fiscal years before us. Nor do we find helpful petitioner's demonstration that its rate of return on its invested capital over the 9-year period covering the fiscal years ending January 31, 1956 through 1964 compares favorably with the earnings of some eight corporations which purportedly were comparable to petitioner. Not only does it appear that all eight of these corporations were "substantially larger" than petitioner, but the witness (petitioner's public accountant) who presented this facet of the testimony, merely expressed his opinion in the form of a conclusion that these other corporations were comparable and we cannot tell from this record how he arrived at his conclusions. We also find scant value, for the purpose of determining the reasonableness of the compensation paid to Rodgers, in a comparison of petitioner's rate of return during the fiscal years ended January 31, 1963 and *265 1964 with the rate of return earned during this period by the 500 largest corporations in the United States. We have considered all of the evidence and all of petitioner's arguments and we do not believe that petitioner has met its burden of proof. We find, and so hold, that a reasonable compensation for the services of Rodgers during each of the fiscal years ended January 31, 1963 and 1964 was not in excess of the amount determined by respondent, i.e., $30,000. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the 1954 Internal Revenue Code↩, as amended.
2. Derry Warehouse Co. did not engage in any trading functions. Moreover, there are indications that the operations of Derry Warehouse Co. were significantly larger than those of petitioner.↩