Mulder Bros., Inc., [1] Formerly Michigan Door Company v. Commissioner. Mulder Bros., Inc., Transferee, Formerly Michigan Door Company, Successor by merger to Mulder Bros., Inc. v. Commissioner. Louis N. Mulder and Catherine Mulder v. Commissioner. Mulder Bros., Inc., Transferee, Formerly Michigan Door Company, Successor by merger to C. and L. Realty Company v. Commissioner. Mulder Bros., Inc. v. Commissioner
Docket Nos. 1741-64 - 1744-64.
United States Tax Court
T.C. Memo 1967-43; 1967 Tax Ct. Memo LEXIS 217; 26 T.C.M. (CCH) 217; T.C.M. (RIA) 67043; March 8, 1967
Robert W. Tripp, for the petitioners in all docket numbers. J. Connor Austin, for the petitioners in Docket No. 1743-64. Charles R. Abbott, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following deficiencies and additions to tax: Addition to Tax
Docket
T/Y Ended
Income Tax
Sec. 6653(b),
Number
Petitioner
4/30
Deficiency
1954 IRC
1741-64
Mulder Bros., Inc., etc.
1955
$ 2,219.55
$ 1,109.77
1956
2,739.70
1,369.85
1957
3,163.38
1,581.69
1958
2,325.58
1,162.79
1959
54,268.80
27,134.40
T/Y Ended
12/31
1742-64
Mulder Bros., Inc., Transferee, etc.
1955
8,153.90
4,076.95
1956
8,170.58
4,085.29
1957
5,897.63
2,948.81
Period 1/1/58-
10/31/58
24,409.03
12,204.51
T/Y Ended
12/31
1743-64
Louis N. Mulder and Catherine Mulder
1955
5,426.71
2,713.35
1956
10,982.39
5,491.19
1957
14,005.26
7,002.63
1958
20,809.29
10,404.64
T/Y Ended
11/30
1744-64
Mulder Bros., Inc., Tranferee, etc.
1956
1,290.00
1957
2,203.50
1958
1,976.00
*218 The issues in these consolidated cases are (1) whether respondent properly disallowed deductions by the corporations involved for salary payments, travel and entertainment expenses, and personal expenditures and whether any of the disallowed expenditures were properly includable in the individual taxpayer's income for the years involved; (2) whether Michigan Door Company understated its closing inventory for the taxable year ended April 30, 1959; (3) whether Mulder Bros., Incorporated realized income of $10,000 in connection with the surrender of a lease in 1955; (4) whether Mulder Bros., Incorporated realized income from the sale of reject doors in 1955, 1956, and 1957; (5) whether Mulder Bros., Incorporated received a purchase rebate in 1957 which it failed to report on its return; (6) whether Mulder Bros., Incorporated failed to reduce its purchases account by $18,000 in the period January 1, 1958 through October 31, 1958 because of the cancellation of a purchase order in that amount and whether the handling of this transaction resulted in additional income of $18,000 to the Mulders for that year; (7) whether respondent properly disallowed a deduction in 1956 for a pension fund *219 contribution on behalf of Catherine Mulder; (8) whether respondent properly disallowed deductions claimed by C. & L. Realty Co. as interest paid on loans in the taxable year ended November 30, 1956, 1957 and 1958; (9) whether any part of the underpayment of tax for the years in issue in docket Nos. 1741-64, 1742-64 and 1743-64 was due to fraud within the meaning of section 6653(b); and (10) whether any of the years in issue in docket Nos. 1741-64, 1742-64 and 1743-64 is barred by the statute of limitations within the meaning of section 6501. Findings of Fact Some of the facts were stipulated and they are so found. Louis N. and Catherine Mulder, husband and wife, are residents of Ada, Michigan. They filed joint Federal income tax returns for the years 1955, 1956, 1957, and 1958 with the district director of internal revenue, District of Michigan at Detroit, Michigan. The corporate petitioner is a Michigan corporation with its principal office in Grand Rapids, Michigan. Michigan Door Company filed its corporation income tax returns for the taxable years ended April 30, 1955, 1956, 1957, 1958 and 1959 with the district director of internal revenue, District of Michigan at Detroit, *220 Michigan. During the years 1955 through October 31, 1958, Mulder Bros., Incorporated was a Michigan corporation with its principal office in Grand Rapids, Michigan. It filed its corporation income tax returns for the years 1955, 1956, 1957 and for the taxable period from January 1, 1958 through October 31, 1958 with the district director of internal revenue, District of Michigan, at Detroit, Michigan. During the years in issue the C. & L. Realty Company, Inc. was a Michigan corporation with its principal office in Grand Rapids, Michigan. It filed its corporation income tax returns for the taxable years ended November 30, 1956 through 1958 with the district director of internal revenue, District of Michigan at Detroit, Michigan. On October 31, 1958, Mulder Bros., Incorporated merged into Michigan Door Company, with Michigan Door Company being the surviving corporation. The assets of Mulder Bros., Incorporated, with a fair market value in excess of $80,000, were transferred to Michigan Door Company, and as a result of the merger and transfer of assets Mulder Bros., Incorporated became insolvent and has remained insolvent and wholly without assets. On or about August 1, 1960, the *221 C. and L. Realty Company merged with Michigan Door Company, with Michigan Door Company being the surviving corporation. The assets of the C. and L. Realty Company, with a fair market value in excess of $10,000, were transferred to Michigan Door Company, and as a result of the merger and transfer of assets the C. and L. Realty Company became insolvent and has remained insolvent and wholly without assets. During 1962 the corporate name of Michigan Door Company was changed to Mulder Bros., Incorporated. It is stipulated that Mulder Bros., Incorporated (formerly Michigan Door Company) is liable as a transferee, at law and in equity for any deficiencies in income taxes which may be determined to be due from Mulder Bros., Incorporated for the years 1955, 1956, 1957 and for the taxable period from January 1, 1958 through October 31, 1958, plus interest. It is also stipulated that Mulder Bros., Incorporated (formerly Michigan Door Company) is liable as a transferee, at law and in equity, for any deficiencies in income taxes which may be determined to be due from the C. and L. Realty Company for the taxable years ended November 30, 1956, 1957 and 1958, plus interest. Mulder Bros., Incorporated *222 (formerly Michigan Door Company) is the petitioner in docket No. 1741-64 and the petitioner and transferee of assets in docket Nos. 1742-64 and 1744-64. During the years in issue Michigan Door Company was the sole stockholder of Mulder Bros., Incorporated, which corporation manufactured wood doors. Michigan Door Company was the sales outlet for doors manufactured by Mulder Bros., Incorporated. During the years in issue Louis N. Mulder was president of Michigan Door Company, Mulder Bros., Incorporated, and the C. and L. Realty Company, and he was sole stockholder of Michigan Door Company and the C. and L. Realty Company. During the years in issue Catherine Mulder was secretary-treasurer of Michigan Door Company and Mulder Bros., Incorporated. Louis N. Mulder went to school through the fifth grade. He started in the door manufacturing business sometime in 1950. During the years here in issue Louis maintained close control over the daily operations of the door manufacturing business. He was at the plant nearly every day, and it was customary for him to arrive early and leave late. Most of the sales of the Michigan Door Company were obtained through mail orders or by telephone. A perpetual *223 inventory was maintained so that the number of doors available could be readily ascertained. During the years 1955, 1956, 1957 and 1958, Louis received weekly checks from Mulder Bros., Incorporated and from Michigan Door Company purportedly for travel expenses. He instructed the bookkeeper to make these checks out in uneven amounts, with the weekly checks received from the two corporations usually making a total of $80. For example, on December 7, 1956, he received a check from Michigan Door Company in the amount of $31.05 and on the same date he received a check from Mulder Bros., Incorporated in the amount of $48.95, for a weekly total of $80; on September 13, 1957 he received a check from Mulder Bros., Incorporated in the amount of $46.30 and on the same date received a check from Michigan Door Company in the amount of $33.70. During the year 1956 numerous expenditures totaling $7,187.76, in connection with the construction of a cottage at Grand Haven, Michigan, were paid by and charged to Mulder Bros., Incorporated. The cottage was owned by Louis Mulder and his wife. During the years 1955, 1956, 1957, 1958 and 1959 numerous personal expenditures of Louis N. Mulder were paid *224 by Mulder Bros., Incorporated and Michigan Door Company. These personal expenditures included utility bills, painting various parts of his residence, household equipment, country club expenses and payments to a maid employed in the Mulder residence. In 1958 a payment of $190 to Louis N. Mulder's father-in-law was made by Mulder Bros., Incorporated and charged to the corporation, and in the fiscal year 1959 a payment of $250 was made to him by Michigan Door Corporation and charged to the corporation. In the fiscal year 1959 a payment of $2,336.87 was made by Michigan Door Company and charged to the corporation for a fence constructed at the Mulder residence. During the years 1955, 1956, 1957 and 1958 Catherine Mulder was paid a salary of $1,365, $1,360, $4,675 and $3,706, respectively, from Mulder Bros., Incorporated and during the fiscal years 1955, 1956, 1957 and 1959 she was paid a salary in the respective amounts of $3,120, $3,288, $1,878 and $2,264 from Michigan Door Company. During the period here involved either the Michigan Door Company or Mulder Bros., Incorporated sent doors to the Zeeland Sash & Door Company for further processing. The president of the Zeeland Sash & Door *225 Company was Cyrus Mulder, who was Louis' brother. Any doors damaged during the processing were usually sold by the Zeeland Sash & Door Company as "reject" doors, and in 1954, 1955, 1956 and 1957 the Zeeland Sash & Door Company issued checks payable to Louis N. Mulder for amounts received from "reject" door sales in the respective amounts of $295, $201, $216 and $420. On October 17, 1958, Mulder Bros., Incorporated issued a check to Michigan Door Company in the amount of $18,000 and charged the amount to purchases. Michigan Door Company secured a letter of credit in the amount of $18,000 from Michigan National Bank drawn in favor of the American Wood Products International Corporation, New York City. Michigan Door Company issued a note to the Michigan National Bank in the amount of $18,000, together with an assignment of all receivables in return for the letter of credit. The letter of credit was not used and the Michigan National Bank returned the note and assignment of receivables to the Michigan Door Company. On November 21, 1958, the Michigan National Bank received [a] check (dated November 21, 1958) in the amount of $18,000 from the Michigan Door Company. The Michigan National *226 Bank issued the following instruments (all dated November 21, 1958) in exchange for said check: Instrument
Amount
Payee
Time Certificate of Deposit
$5,000
L. & C. Mulder
Time Certificate of Deposit
5,000
L. & C. Mulder
Time Certificate of Deposit
5,000
L. & C. Mulder
Bank Money Order
2,000
Louis Mulder
Bank Money Order
1,000
Louis Mulder
On October 25, 1962, after a jury trial in the United States District Court (Western District of Michigan, Southern Division), Louis N. Mulder was found guilty of evading his income tax for the year 1958. A verdict of not guilty was returned by the jury on the remaining 11 counts of the indictment involving the income taxes of Louis N. Mulder, Michigan Door Company and Mulder Bros., Incorporated for taxable years which are before us here. On November 8, 1962, the United States District Court entered its judgment in accordance with the verdict of the jury, which judgment is now final. In docket No. 1741-64 (Mulder Bros., Incorporated), the respondent (1) disallowed deductions for salary paid to Catherine Mulder by Michigan Door Company in the taxable years ended April 30, 1955, 1956, 1957 and 1959 in the respective *227 amounts of $3,120, $3,288, $1,878 and $2,264; (2) disallowed deductions by Michigan Door Company in the taxable years ended April 30, 1955 through 1959 for "personal expenses of the Corporation's officers and unsubstantiated travel and entertainment expense in the total respective amounts of $4,278.51, $5,844.33, $4,205.42, $4,472.26 and $9,195.25"; (3) disallowed deductions for salaries paid by Michigan Door Company in the taxable year ending April 30, 1959 to the Mulders' personal maid and to Louis N. Mulder's father-in-law in the respective amounts of $108.27 and $250; and (4) determined that the closing inventory of Michigan Door Company (now Mulder Bros., Incorporated) as of April 30, 1959 was understated by $122,620.11 and the closing inventory of Mulder Bros., Incorporated as of October 31, 1958 was understated by $21,254.78. Respondent's explanation of the net effect for the taxable year ended April 30, 1959 of these two adjustments is as follows: It has been determined that the closing inventory of Michigan Door Company (now known as Mulder Bros., Inc.) was understated in the amount of $122,620.11. It has also been determined that the ending inventory of Mulder Bros., Inc. *228 for the taxable period January 1, 1958 through October 31, 1958 was understated by $21,254.78 and since Michigan Door Company (now known as Mulder Bros., Inc.) took over the assets of Mulder Bros., Inc. as of November 1, 1958, the opening inventory of Michigan Door Company (now known as Mulder Bros., Inc.) should be increased by this amount. The net adjustment to inventory is computed as follows: Closing inventory
understated
$122,620.11
Opening inventory
understated
(21,254.78)
Net understatement
$101,365.33
In Docket No. 1742-64 (Mulder Bros., Incorporated, Transferee) the respondent (1) disallowed deductions for salary payments to Catherine Mulder by Mulder Bros., Incorporated in 1955, 1956, 1957 and for the period from January 1, 1958 to October 31, 1958 in the respective amounts of $1,365, $1,360, $4,675 and $3,706; (2) determined that Mulder Bros., Incorporated received income of $10,000 in 1955 in connection with a payment received for the surrender of certain leasehold improvements; (3) determined that Mulder Bros., Incorporated received additional income from the sale of "reject" doors in 1955, 1956, and 1957 in the respective amounts of $201, $216 *229 and $420; (4) determined that Mulder Bros., Incorporated received additional income of $328.75 in 1957 in connection with a purchase rebate made by the Atkinson Lumber Company; (5) determined that Mulder Bros., Incorporated received additional income of $18,000 in the period January 1, 1958 through October 31, 1958 in connection with the cancellation of a purchase order; (6) determined that Mulder Bros., Incorporated understated its closing merchandise inventory as of October 31, 1958 in the amount of $21,254.78; (7) disallowed a deduction of $195 claimed by Mulder Bros., Incorporated in 1956 as a contribution to a pension trust plan on behalf of Catherine Mulder; and (8) disallowed deductions claimed by Mulder Bros., Incorporated in 1955, 1956, 1957 and for the period January 1, 1958 through October 31, 1958 for travel and entertainment expenses, automobile expense, utility bills, salary paid to the maid in the Mulder residence, personal expenses of the Mulders, payments to Louis N. Mulder's father-in-law and payments made for the construction of a cottage owned by the Mulders in the total amounts of $4,114.56, $13,941.66, $8,398.69 and $5,414.98. In Docket No. 1743-64 the respondent *230 determined that Louis N. Mulder and his wife received constructive dividends and additional income from Mulder Bros., Incorporated and Michigan Door Company in the years 1955 through 1958 in the following amounts (less dividend exclusion): Year
Mulder Bros., Inc.
Michigan Door
1955
$ 6,265.56
$ 5,209.27
1956
15,107.66
5,451.00
1957
20,803.66 *
4,158.78
1958
23,864.98
11,602.57
In Docket No. 1744-64 (Mulder Bros., Incorporated, Transferee of the C. and L. Realty Company) disallowed deductions claimed by the C. and L. Realty Company for salary paid to Louis N. Mulder, president of the corporation, to the extent of $1,800 in each of the fiscal years ended November 30, 1956, 1957 and 1958, and respondent also disallowed deductions for interest on certain outstanding debenture notes in the fiscal years ended November 30, 1956, 1957 and 1958 in the respective amounts of $2,500, $2,437.50 and $2,000. A part of the underpayment of taxes for each of the taxable years ended April 30, 1955 through 1959 in Docket No. 1741-64, for the taxable years 1955 through 1957 and for the taxable *231 period from January 1, 1958 through October 31, 1958 in Docket No. 1742-64, and for the taxable years 1955 through 1958 in Docket No. 1743-64 was due to fraud. The income tax returns filed by petitioners in Docket Nos. 1741-64, 1742-64 and 1743-64 for each of the taxable years there involved were false and fraudulent with intent to evade tax. Opinion In July of 1959, respondent's agents started examining the returns filed in the years 1955 through 1958 or 1959 of Louis Mulder and his corporations. On February 5, 1964 over four and a half years later, respondent determined deficiencies existed in the returns filed by these taxpayers in said years. Because of the lapse of time and the 3-year statute of limitations pleaded in Docket Nos. 1741-64, 1742-64 and 1743-64, respondent had the first burden of proving that the returns filed by the taxpayers in said dockets were "false or fraudulent [returns] with the intent to evade tax" within section 6501(c) (1) of the 1954 I.R.C.
Respondent showed that throughout the entire period here involved Louis N. Mulder filed *232 joint returns each with his wife, Catherine, and he was the president of Michigan Door Company and Mulder Bros., Incorporated, and the sole stockholder of Michigan Door Company that owned all of the stock of Mulder Bros., Incorporated. He signed all of his personal returns and all of the returns here involved for the entities as president with the exception of the return for the period January 1, 1958 to October 31, 1958 for Mulder Bros., Incorporated which is signed by Catherine J. Blok as "Ass't Secretary." Throughout the entire period here involved the funds of both corporations were constantly used to pay Mulder with disguised entries or to pay the expenses of the Mulder family and the treatment of such expenditures was in such a manner as to make them appear as business expenses or deductions of the corporations. Petitioners' counsel readily conceded in his opening statement at the trial that there were items of a personal nature paid by the corporations which he (Mulder) should have paid back to the corporations. First we have the weekly checks made out to Louis by both corporations, deliberately made out in odd amounts (which, however, always added up to $80 a week) which *233 were always entered on the books of the corporations as entertainment or traveling expenses. The bookkeeper testified it was Louis Mulder who told him to issue these weekly traveling expense checks in odd amounts to always total $80. He said he was never told what these particular checks were issued for. [2]
There are here three stipulated exhibits showing in all over a hundred items totaling from about two to four thousand dollars each year paid by the two corporations during the years 1955 through 1959, which were without question personal expenses of the Mulder family. The items range from the home utility bill and the salary of the personal maid who worked in the Mulder home (and was treated as an employee of one of the corporations) to the cost of construction of the Mulder's lake cottage. These items were not placed in any officer's drawing account but were scattered in various corporate accounts so the auditors who came two or three times *234 a year and who made out the corporate returns would naturally include the items as corporate business expense items. The bookkeeper said he was told to do this by Louis Mulder and that he believed the only corporation that had an officer's drawing account was Michigan Door Company and this was only used for big items such as the purchase of a car. In addition, we have the Zeeland Sash & Door Company checks mentioned in our findings which were cashed and the money turned over to Louis Mulder. This is enough to show that all of the returns for the years in question in Docket Nos. 1741-64, 1742-64, and 1743-64 were false and fraudulent with intent to evade tax under section 6501(c) (1) of the 1954 I.R.C. Mulder knew his corporations were paying thousands of dollars of his personal expenses each year. He knew this was being done in a manner that served to reduce the profits his corporations were reporting on their income tax returns from the manufacture and sale of doors. These items of a personal nature that the companies paid for him, together with the other payments to him, all constituted other income he received each year in addition to his salary which he *235 deliberately did not report on his income tax returns. We have held the sole stockholder's practice of charging personal items to corporate business expense is evidence of fraud by both the individual officer and his corporation. See Elmer J. Benes, 42 T.C. 358 (1964), affd. 355 F. 2d 929 (C.A. 6, 1966). We hold the deficiency determinations in the above dockets are not barred by the statute of limitations. We turn now to the deficiency determinations in all of the dockets. Most of the issues involved are factual and respondent's determinations as to such issues are presumptively correct. Welch v. Helvering, 290 U.S. 111. Petitioners have the burden of proving error in respondent's determinations, but the evidence produced at the trial was extremely scant and in most instances was generally insufficient to meet the requisite burden of proof. As to some of the issues, the petitioners made no serious effort to produce any evidence and, absent any concessions *236 by the parties, petitioners cannot prevail as to such issues. In respondent's determination of deficiency of Michigan Door Company there is a conclusion that its April 30, 1959 closing inventory was understated in the amount of $122,620.01. This closing inventory of finished products and raw material was stated to be $96,360.88 in its return and the corporation's physical inventory showing said amount at the close of April 1959 was produced and admitted in evidence. The inventory of Michigan Door Company consisted of (1) finished doors and (2) raw materials. A perpetual inventory for finished doors was kept by office personnel. In order to reconstruct the corporation's closing inventory as of April 30, 1959, the respondent used as a starting point the results of an actual physical inventory taken on January 20, 1960 by the revenue agents with the assistance of Louis N. Mulder, Wayne Spillane (the warehouse manager) and Lloyd Nesbitt (the plant manager). Only the raw material on hand was counted on this occasion. The perpetual inventory was accepted as an accurate count of finished doors. [3]
*237 Petitioner had the burden of proof to show respondent's computation of understatement was wrong. However, respondent, with commendable fairness, put his agent on the stand and the agent testified as to his method of reconstructing the April 30, 1959 inventory. He used the perpetual inventory, the January 20, 1960 totals to which were added the products sold since April 30, 1959, and deducted certain raw materials purchased during said period, and he made certain estimates and approximations. This method was followed to reconstruct the April 30, 1959 inventory of Michigan Door Company for oak, lauan and ribbon mahogany doors. To reconstruct the April 30, 1959 inventory for birch doors and "skins" the respondent was compelled to approximate the understatement of inventory at 30 percent, which estimate was based upon the inventory understatements computed by respondent for the other categories of finished doors and "skins" on the apparent assumption that the understatements were roughly parallel in each of the several categories. On the whole, we think the agent's reconstruction fairly shows *238 an understatement but upon close analysis of the various steps taken by him we are satisfied there should be some reduction in the understatement as computed by him. Among the considerations that lead us to this conclusion would be (1) there is evidence that the January 20, 1960 perpetual inventory could be overstated due to a time lag in office procedure, (2) the 30 percent figure of understatement of the birch doors in the agent's computation is admittedly an estimate or approximation, (3) the record shows that normally a year-end inventory took three days while here the inventory of January 20, 1960 (the starting point of respondent's reconstruction) was hurriedly taken in a few hours. After considering the above and using our best judgment, and mindful of the fact that the burden was on petitioner, we hold the inventory of April 30, 1959 was understated in the amount of $70,000. On October 31, 1958, Mulder Bros., Incorporated merged into its parent corporation, Michigan Door Company (corporate name changed to Mulder Bros., Incorporated in 1962). In Docket No. 1742-64 (Mulder Bros., Incorporated, Transferee), respondent determined that the closing inventory of Mulder Bros., *239 Incorporated as of October 31, 1958 was understated by $21,254.78 due to the omission of a purchase of merchandise in that amount from American Wood Products which was not included in closing inventory. Petitioner in that docket number has not shown that this adjustment was in error. We sustain respondent on this issue. Respondent made a corresponding adjustment in Docket No. 1741-64 (Mulder Bros., Incorporated) by increasing the opening inventory of Michigan Door Company (which had taken over all the assets of Mulder Bros., Incorporated) by the same amount, i.e., $21,254.78, which resulted in a determination that Michigan Door Company had understated its taxable income for its taxable year ended April 30, 1959 due to understatements of inventory in the net amount of $101,365.33 ($122,620.11 minus $21,254.78). Respondent determined in Docket No. 1742-64 that Mulder Bros., Incorporated had additional income from the sale of "reject" doors in 1955, 1956 and 1957 in the respective amounts of $201, $216 and $420. During these years Mulder Bros., Incorporated would send doors to the Zeeland Sash & Door Co. for glazing. [4] Some of the doors were damaged either in handling or in the glazing *240 process and these damaged doors were not returned to Mulder Bros., Incorporated but would be sold in that condition by Zeeland Sash & Door Co., which would periodically remit by checks payable to Louis Mulder, not to Mulder Bros., Incorporated, the amounts received from such sales. The checks made out by Zeeland Sash & Door Co. payable to Louis N. Mulder are in evidence. There is testimony from an officer of Zeeland Sash & Door Co. indicating that they were instructed by Louis Mulder to make these checks payable to him personally. Louis' only explanation at the trial was that these payments were placed in a "special pot" which would be used for trips to Texas and to the West Coast to learn new techniques for glazing doors. We give little credence to this explanation. Even if this were indeed the purpose, it is difficult to see why the corporation itself could not set aside the special fund. We find that the income from the sale of "reject" doors in 1955, 1956 and 1957 is taxable to Mulder Bros., Incorporated in those years. Respondent is sustained on this issue. Respondent determined in Docket No. 1742-64 that *241 Mulder Bros., Incorporated had additional income of $18,000 in the taxable period January 1, 1958 through October 31, 1958 through its failure to show on its books the cancellation of a purchase order previously charged to the purchases account. Most of the facts in this issue have been fully stipulated and we have outlined them in our findings of fact. On October 17, 1958, Mulder Bros., Incorporated issued a check for $18,000 to Michigan Door Company and charged this amount to purchases. Michigan Door Company obtained a letter of credit in this amount from Michigan National Bank in favor of the American Wood Products International Corporation. Michigan Door Company issued a note for $18,000 to the bank, together with an assignment of all receivables. Apparently the purchase was canceled. The letter of credit was not used and the bank returned the note and assignment of receivables to Michigan Door Company. On November 21, 1958, the bank received a check for $18,000 from the Michigan Door Company, and on the same date the bank issued three certificates of deposit, each in the amount of $5,000, with Louis N. Mulder and his wife as payees, and two bank money orders, totaling $3,000, *242 with Louis Mulder as payee. It is fairly clear from these facts that the purchases account of Mulder Bros., Incorporated was overstated by $18,000 in the taxable period ending October 31, 1958, and that the steps taken were designed to funnel $18,000 of corporate funds to Louis Mulder. There is no evidence in the record to suggest some other explanation. We sustain respondent on this issue in Docket No. 1742-64. On these facts, we also sustain respondent's determination in Docket No. 1743-64 that Louis N. and Catherine Mulder received additional income of $18,000 in 1958. During the years 1955 through 1958 and for a part of 1959, Louis Mulder caused both Mulder Bros., Incorporated and Michigan Door Company to issue weekly checks payable to him, which, though deliberately made out in odd amounts, generally totaled $80 a week and they were charged by both corporations to business expenses. During 1955 the weekly checks issued by Mulder Bros., Incorporated were, for the most part, in the amount of $40.25, while the weekly checks issued by Michigan Door Company were generally in the amount of $39.75. The pattern often varied in subsequent years, although the weekly checks continued, *243 for the most part, to add up to $80 a week. When Mulder Bros., Incorporated merged into Michigan Door Company on October 31, 1958, it appears that the weekly checks were then issued by Michigan Door Company to Louis N. Mulder in the amount of $80. When Louis bought a house in Phoenix, Arizona, and stayed there with his family about three months late in 1958 and early in 1959, these weekly checks of $80 continued to be issued to him. In Docket No. 1741-64 respondent allowed $180 in each of the taxable years ended April 30, 1955 through 1959 and disallowed the business expense deductions claimed by Michigan Door Company for the remaining weekly payments made to Louis. In Docket No. 1742-64 respondent disallowed deductions for travel and entertainment expenses claimed by Mulder Bros., Incorporated in connection with these weekly payments to Louis in the years 1955, 1956, 1957 and for the taxable period from January 1, 1958 through October 31, 1958 in the respective amounts of $2,080, $2,080, $2,080 and $1,760. It appears fairly certain from the record that Louis spent long hours at the plant and did very little traveling. Most of the sales were received through mail order or by telephone. *244 In fact, the plant foreman (1954 through September 1957) testified that 95 percent of the sales resulted from mail orders. The record shows that Louis was reimbursed by specific checks (apart from the weekly checks) for travel expenses. At the trial, Louis testified generally that he took a few business trips each year but admitted "I didn't keep track of it." He offered no persuasive evidence other than these general statements. Moreover, we are unconvinced that he incurred any travel, entertainment or other business expenses during his brief stay in Phoenix, Arizona, where he went mainly because of his arthritic condition. On the basis of the whole record, we cannot find that the two corporations were entitled to any deduction for travel and entertainment expenses in excess of those allowed by the respondent. We sustain respondent on these issues in Docket No. 1741-64 and Docket No. 1742-64. During 1956 a cottage was constructed for Louis N. Mulder and his wife at Grand Haven on Lake Michigan. Expenses incurred in the construction were paid by Mulder Bros., Incorporated in the stipulated amount of $7,187.76 and they were charged to various accounts on the corporate records. Respondent *245 disallowed a deduction claimed by Mulder Bros., Incorporated in 1956 for the expenses incurred for the cottage (Docket No. 1742-64). We sustain respondent on this issue. The cottage was owned by the Mulders and there is no persuasive evidence to indicate that it was anything more than a private cottage for their personal use. Petitioner makes a brief argument that some portion of these expenses should be allowed as deductions by the corporation because the cottage, together with a speedboat owned by the Mulders, was used to entertain employees of the corporation. Petitioner refers us to testimony by Wayne Spillane, a former employee of Mulder Bros., Incorporated. But the testimony of Spillane (who, during the years 1959 through 1960 was the son-in-law of Louis N. Mulder) was merely that he entertained summer employees in the speedboat when they came out to the cottage, and he also stated that the "younger kids" were primarily interested in such diversion. But his testimony also revealed that he and his relatives and in-laws used the cottage in 1956. We do not believe, on this record, that the cottage was meant to serve any business purpose of the corporation or that it was used in *246 any part for business purposes during 1956. Moreover, even if some occasional business entertaining did take place, we do not see how this would turn a part of the construction costs of the cottage into a business expense deductible by the corporation. Prior to June 1950 Louis N. Mulder leased property on Franklin Street in Grand Rapids, Michigan, for a term ending September 30, 1960. Louis testified that he in turn sub-leased this same property to the Michigan Door Company (which corporation later became Mulder Bros., Incorporated). About 1955, the plant was moved to new premises. Louis testified that the lessor of the Franklin Street property "asked me if I would release the lease * * * [and] give him back the property" and that "for the abandonment of the property he would give me $10,000 by note." Louis agreed to this offer to cancel the lease and he received a note for $10,000 which he treated as his own income on his income tax return. Respondent did not cross-examine Louis about the lease cancellation. We can find no support in the record for respondent's position in Docket No. *247 1742-64 that as a result of the lease cancellation in 1955, Mulder Bros., Incorporated realized taxable income of $10,000 in 1955. Respondent attempts a finespun rationalization on brief for his position, but it is conjectural in nature and it is not supported by anything in this record. We sustain the petitioner in Docket No. 1742-64 on this issue. Respondent determined in Docket No. 1742-64 that Mulder Bros., Incorporated had additional income of $328.75 in 1957 because of a purchase rebate in that amount made by Atkinson Lumber Company. Respondent's explanation in the notice of deficiency is that the rebate was made to Louis Mulder instead of to Mulder Bros., Incorporated, that the check was cashed by him, and that the corporation did not receive any credit for that amount. Petitioner has not met its burden on this issue. We sustain respondent on this issue. Respondent determined in Docket No. 1743-64 that Louis Mulder received additional income of $9,706.22 in 1957, with the explanation that this amount represented a bonus received by Louis Mulder in that year from Mulder Bros., Incorporated. Petitioner has offered no evidence to meet his burden on this issue. We sustain respondent *248 on this issue. In Docket No. 1741-64 the respondent disallowed a deduction of $108.27 in the taxable year ended April 30, 1959 for payments by Michigan Door Company to the maid in the Mulder's residence, and respondent also disallowed a deduction of $250 in the same taxable year for payments by Michigan Door Company to Louis Mulder's father-in-law. In Docket No. 1742-64 the respondent disallowed deductions of $747.95, $738.52, $819.43 and $622.85 in the years 1955 through 1957 and for the taxable period of January 1, 1958 through October 31, 1958 for payments by Mulder Bros., Incorporated to the maid in the Mulder residence, and respondent also disallowed a deduction of $190 in the taxable period of January 1, 1958 through October 31, 1958 for payments made by Mulder Bros., Incorporated to Louis Mulder's father-in-law. Petitioners have offered no evidence to show these payments were ordinary and necessary business deductions. As to Louis Mulder's father-in-law, there was testimony by the warehouse manager for Mulder Bros., Incorporated who was employed there from 1954 to 1960, that the father-in-law was not an employee there. Nor is there any evidence to show that he was employed *249 by either Mulder Bros., Incorporated or by Michigan Door Company in some other capacity. We sustain respondent on these issues. In Docket No. 1741-64 respondent disallowed deductions for certain expenditures by Michigan Door Company in each of the fiscal years ended April 30, 1955 through 1959 and also disallowed deductions for certain expenditures by Mulder Bros., Incorporated (Docket No. 1742-64) in each of the years 1955, 1956, 1957 and for the taxable period from January 1, 1958 through October 31, 1958 on the ground that they represented personal expenditures for the benefit of Louis Mulder and his family for such items as gasoline, insurance, utilities and other miscellaneous items of merchandise and services. Detailed lists of these personal expenditures made by both corporations for the benefit of the Mulders have been placed in evidence and it appears that Louis Mulder examined such lists and agreed that many of the categories there listed were personal expenditures. Petitioners in these two dockets have offered no satisfactory evidence to show that the amounts remaining here in issue were ordinary and necessary business expenses. Respondent is sustained on those issues *250 in Docket No. 1741-64 and in Docket No. 1742-64. We have found above that the numerous expenditures made by Mulder Bros., Incorporated and by the Michigan Door Company were in fact personal expenses of Louis N. and Catherine Mulder or for their economic benefit and were therefore not deductible by the corporations as ordinary and necessary business expenses. Respondent determined in Docket No. 1743-64 that these corporate expenditures constituted additional taxable income for Louis N. and Catherine Mulder in the years 1955 through 1958. Petitioner's entire argument on brief is simply that these expenses were business expenses of the corporations and therefore not additional income to Louis and Catherine. Louis completely controlled both corporations during the years before us and on this record it is clear that the use of corporate funds for the personal expenditures and other economic benefits for the Mulder family, as well as the income of the corporation diverted to Louis N. Mulder, constitute taxable income in the years 1955 through 1958 to Louis N. and Catherine Mulder, see American Properties, Inc., 28 T.C. 1100, *251 affd., 262 F. 2d 150 (C.A. 9, 1958), and we so hold. It is stipulated that Michigan Door Company made payments (as salary) to Catherine Mulder in the fiscal years ended April 30, 1955, 1956, 1957 and 1959 in the respective amounts of $3,120, $3,288, $1,878 and $2,264, and it is further stipulated that Mulder Bros., Incorporated also made payments to Catherine Mulder in 1955, 1956, 1957 and 1958 in the respective amounts of $1,365, $1,360, $4,675 and $3,706. In Docket Nos. 1741-64 and 1742-64 the respondent disallowed deductions claimed by the corporation for these payments, with the explanation that it was not established that Catherine Mulder performed any services for the corporations or that the amounts paid to her constituted ordinary and necessary business expenses. The question of what constitutes reasonable compensation within the meaning of section 162(a)(1) of the 1954 I.R.C. is one of fact to be determined by the circumstances of each case. Courts consider several factors in making such a determination, Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 *252 (C.A. 6, 1949), Geiger & Peters, Inc., 27 T.C. 911, but it is not necessary to enumerate them here because, on this record, there is no satisfactory evidence to show that Catherine performed any services whatever for the corporations during these years. Louis N. Mulder testified that his wife was ill at the time of the trial. Consequently, we have no testimony from Catherine. There is no evidence that her role as secretary-treasurer of the two corporations required any services or that she, in fact, did perform any services in such capacity. There is evidence that there was a normal complement of office personnel, i.e., secretaries and a bookkeeper, to perform the usual clerical operations. Moreover, we are unimpressed with the suggestion by Louis that Catherine helped with the advertising. We find, on the basis of this record, that no portion of these payments made by the two corporations to Catherine Mulder constituted reasonable compensation during the years involved and that such payments were not deductible by the two corporations as ordinary and necessary business expenses. In Docket No. 1742-64 the respondent disallowed a deduction in 1956 for a payment of $195 *253 made by Mulder Bros., Incorporated to a Pension Trust Plan with respect to Catherine Mulder. Respondent determined that she was not a full-time employee of the corporation, that this disqualified her as a member of the trust, and that therefore her share of the contribution to the plan was disallowed. Petitioner has offered no evidence to meet its burden of proof on this issue, and we have already found, in connection with the issue of reasonable compensation, that she did not render any services to Mulder Bros., Incorporated during the years before us. We sustain respondent on this issue. In Docket No. 1744-64 respondent allowed a deduction of $600 and disallowed the remaining $1,800 deduction for amounts paid by C. and L. Realty Company to Louis N. Mulder as salary in each of the taxable years ended November 30, 1956, 1957 and 1958. The question of an allowable deduction for reasonable compensation is one of fact. Geiger & Peters, Inc., supra. Louis was the president and sole stockholder of C. and L. Realty Company during the years in issue. The corporation owned a new building which was built some time in 1955. (The corporation's income tax returns - in Schedule *254 J - indicate that the building, sidetrack, parking lot, office equipment and heating equipment were acquired in June 1955.) In his testimony, Louis referred to it as "a $450,000 building." He also testified that "I was my own contractor and supervised most of the work being done on this new building to fit in with our production." Our concern here is only with the taxable years ended November 30, 1956, 1957 and 1958, and as to these taxable years there is no satisfactory evidence that the corporation was entitled to a deduction of more than $600 in each taxable year for the personal services actually rendered by Louis. It appears that the new building was divided into two sections, with his controlled corporation (or corporations) occupying one section and the other section leased to a third party. Louis testified that the latter lease was for a monthly rental of $2,300. [5] The tax returns of the C. and L. Realty Corporation do not show any salary expenses (apart from the payments to Louis), expenses for janitorial services, expenditures for repairs (except for an item of about $1,100 in the taxable year ended November 30, 1956), or any of the customary expenses associated with the *255 rental and maintenance of a building. It would be a justifiable inference, under these circumstances, that the expenditures of this nature were borne by the tenants. We have also considered Louis' testimony that he had to obtain a new tenant for a portion of the building after about two years and the services rendered by him. Louis' efforts in this respect were that the proper leasing and rental of the property were among obviously sporadic in nature and we feel they are adequately covered by the amount of salary allowed each year by the respondent. On brief, Louis seeks to justify a substantial salary by pointing to the tremendous growth of his door manufacturing companies. However, these efforts in connection with other corporations have no bearing whatsoever on the reasonableness of his compensation from the C. and L. Realty Company. We have considered all of the evidence and we are not convinced, on this record, that Louis actually rendered personal services to the C. and L. Realty Company to justify a deduction by the corporation for reasonable compensation in excess of $600 for each of the taxable years ended November 30, 1956, 1957 and 1958. We sustain respondent on this issue. *256 In Docket No. 1744-64 the respondent disallowed interest deductions claimed by C. and L. Realty Company in the taxable years ended November 30, 1956, 1957 and 1958 in the respective amounts of $2,500, $2,437.50 and $2,000. These amounts represented interest on $50,000 debenture notes bearing interest at 5 percent originally issued to Louis Mulder. Respondent contends the above amounts were dividend distributions to Louis, apparently on the ground that the $50,000 advanced by Louis to the corporation was not really a loan, but risk capital. Louis testified that a mortgage loan was obtained from a bank in order to finance the construction of the new building and that "[after] the building was two-thirds constructed, mortgage money became very tight in the banks, and the banks cut me off and they said that is all they would go on the mortgage, what we had borrowed." As a consequence, Louis advanced $50,000 to the C. and L. Realty Company and took back notes bearing interest at 5 percent. *257 Whether the notes represented a true indebtedness between the corporation and its controlling stockholder or whether they represented an equity contribution is a question of fact. O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. Various factors have been relied upon by the courts to reach a determination of this issue but, as we stated in Gooding Amusement Co., 23 T.C. 408, 418, affd. 236 F. 2d 159 (C.A. 6, 1956), "the courts have been careful not to lay down any all-embracing rule of general application." We cannot agree with respondent that the thin capitalization argument favors his determination. It appears that the corporation was capitalized at $50,000 and that as of November 30, 1955, the corporation had accounts payable of $116,871.82 and bonds, notes and mortgages payable of $166,591, which liabilities had been reduced by November 30, 1956 to the respective amounts of $92,810.49 and $151,401.21. The C. & L. Realty Company, which was in the rental business, certainly *258 did not require the significant amounts of working capital normally required by a manufacturing corporation. We do not regard the debt-equity ratio of C. and L. Realty Company disproportionate under these circumstances. The debt of $50,000 was duly represented by debenture notes with interest at 5 percent. We have examined all of the evidence and, while the question is not free from doubt, we find upon the whole record that a valid indebtedness existed with respect to these advances to the corporation. We hold that petitioner in Docket No. 1744-64 was entitled to a deduction in each of the taxable years ended November 30, 1956, 1957 and 1958 for the interest payments made on such indebtedness. Respondent determined that a part of the underpayment for each of the taxable years involved in Docket Nos. 1741-64, 1742-64 and 1743-64 "was due to fraud" within the meaning of section 6653(b) of the 1954 I.R.C. The burden rests upon respondent to prove fraud by clear and convincing evidence. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum *259 Opinion of this Court. The acquittal of Louis N. Mulder after a jury trial in the United States District Court on 11 out of 12 counts of wilfully evading both individual and corporate income taxes for the same taxable years here involved is no bar to the imposition of the civil liabilities under section 6653(b) of the 1954 I.R.C. in the cases before us. Helvering v. Mitchell, 303 U.S. 391 (1938). On the other hand, Mulder's conviction of criminal fraud with respect to his 1958 income tax return precludes him from denying that a part of his underpayment of tax for 1958 was due to fraud. John W. Amos, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965). The requisite proof of fraud on the part of the corporations is necessarily to be found in the acts of its officers. See Auerbach Shoe Co., 21 T.C. 191 (1953), affd. *260 216 F. 2d 693 (C.A. 1, 1954). We pointed out earlier that during the entire period here involved the funds of both corporations were constantly used to pay the personal expenses of the Mulder family and that this program was constantly followed. The weekly checks made out to Louis by both corporations were deliberately made out in odd amounts (which, however, neatly dovetailed into a total of $80 a week) which would seem to be an obvious effort to mislead. In 1955, 1956 and 1957 the income from "reject" doors was diverted from Mulder Bros., Inc. to Louis N. Mulder. In 1958, upon cancellation of a purchase order, the amount of $18,000 was diverted to the Mulders through a subterfuge while the purchase account of Mulder Bros., Incorporated remained overstated by that amount. In 1956 the cost of construction of more than $7,000 of a personal lake cottage for the Mulders was charged to Mulder Bros., Incorporated and the expenses were scattered in various corporate accounts. In the taxable year ended April 30, 1959, the cost of a fence (about $2,300) at the Mulder residence was charged to Michigan Door Company. We hold, on the basis of all the evidence, that a part of the *261 underpayments of tax by the corporate petitioners in Docket Nos. 1741-64 and 1742-64 for each of the taxable years there involved was due to fraud within the meaning of section 6653(b) of the 1954 I.R.C.
We also hold that part of the underpayments of tax by the individual petitioners, Louis N. Mulder and his wife, in Docket No. 1743-64 for each of the years 1955 through 1958 was due to fraud within the meaning of section 6653(b) of the 1954 I.R.C. The actions of Louis N. Mulder as president of both corporations cannot be separated from his actions as an individual taxpayer. His fraudulent conduct in understating the corporate income by consistently charging personal expenses in substantial amounts to the corporations also taints the individual tax returns filed by him with his wife during these years. See Elmer J. Benes, supra.It will serve no useful purpose again to repeat these indicia of fraud which we have outlined above and which clearly resulted in the omission of taxable income in significant amounts from the joint *262 tax returns filed by Louis and his wife for these years. See Spies v. United States, 317 U.S. 492 (1943). We are convinced on this record that the pattern of deliberate concealment of income and the evasion of individual income taxes runs through all of the years here involved. Decisions will be entered under Rule 50. Footnotes
1. The corporate petitioner above is called Mulder Bros., Incorporated. However, it has been so named only since 1962. To avoid confusion with a prior corporation also named Mulder Bros., Incorporated, we will henceforth only use the name Mulder Bros., Incorporated, when dealing with the former corporation, and the above named corporate taxpayer will be referred to as petitioner.↩
*. Includes a bonus received by Louis in 1957 in the amount of $9,706.22.↩
2. The bookkeeper told of other traveling expenses submitted in the form of hotel bills and detailed traveling expenses that were paid and the record shows these other traveling expense items that were substantiated were not disallowed.↩
3. Finished doors were made principally from oak, birch, mahogany and lauan. The term "skin" is used to describe the paneling on both sides of a door.↩
4. Louis Mulder's brother, Cyrus, was president of Zeeland Sash & Door Co.↩
5. The income tax returns of the C. and L. Realty Company for the taxable years ended November 30, 1956, 1957 and 1958 show rental income of $48,000, $60,000 and $60,370, respectively.↩