GOOD CHEVROLET, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Good Chevrolet v. Commissioner
Docket No. 3727-75.
United States Tax Court
T.C. Memo 1977-291; 1977 Tax Ct. Memo LEXIS 147; 36 T.C.M. (CCH) 1157; T.C.M. (RIA) 770291; August 30, 1977, Filed *147 In 1971 and 1972, B and S, who were the principal officers and sole shareholders of P, received compensation consisting of modest salaries and substantial bonuses which constituted a predetermined percentage of the profits. P, a Chevrolet dealership, never paid any dividends but, in 1971 and 1972, made substantial additions to a working capital account maintained in accordance with the requirements of Chevrolet.Held, under all the circumstances, the compensation received by B and S in 1971 and 1972 was reasonable and was for services actually rendered. Charles W. Tuckman and Peter T. Chamberlin, for the petitioner. William E. Saul, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioner's Federal income taxes in the amounts of $27,942.00 for 1971 and $37,448.00 for 1972. The issue for decision is whether the amounts paid to the petitioner's two officer-shareholders for the years in issue constituted reasonable compensation for services rendered within the meaning of section 162(a)(1) of the Internal Revenue Code of 1954. FINDINGS OF FACT Some of the facts have been stipulated, and those facts *148 are so found. The petitioner, Good Chevrolet, a California corporation, had its principal place of business in Alameda, Calif., at the time of filing its petition in this case. It filed its Federal income tax return for the taxable year 1971 with the Internal Revenue Service Center at Ogden, Utah, and its return for the taxable year 1972 with the Internal Revenue Service Center at Fresno, Calif.
Since its inception, Good Chevrolet has been engaged primarily in the retail sale of new and used automobiles and trucks as a franchised Chevrolet dealer. Its showroom, used car lots, and service facilities are all located in the City of Alameda, Calif.
John F. Buono and Louis H. Kornik formed Good Chevrolet in September 1955, and purchased an existing Chevrolet dealership in Alameda. At the time of incorporation, Mr. Buono received 30 percent (300 shares) and Mr. Kornik, through Guaranty Chevrolet (Guaranty), received 70 percent (700 shares) of Good Chevrolet's out-standing stock. Mr. Buono was then the corporation's president and chief operating officer and continued to serve as president during the years at issue. Through a series of 14 purchases between July 1956 and February 1958, *149 Mr. Buono increased his ownership interest in Good Chevrolet to 749-1/2 shares. However, by a proxy executed February 20, 1958, Mr. Kornik retained voting control of the corporation until January 25, 1960. At that time, the balance of Guaranty's stock was redeemed by Good Chevrolet, thus vesting complete ownership and control of the corporation in Mr. Buono. Before the formation of Good Chevrolet, Mr. Buono worked for Mr. Kornik at Guaranty in San Diego, Calif. Mr. Buono was hired by Guaranty as a salesman in 1940, was promoted to sales manager, and eventually became vice president and general manager. As vice president and general manager of Guaranty, he was paid a salary of $1,100 a month and a monthly bonus of 11 percent of net profits, although he had no ownership interest in the franchise. From the inception of Good Chevrolet, Mr. Buono has been paid a fixed monthly salary plus a bonus based on net profits before other executive bonuses and taxes. In 1955, Good Chevrolet's board of directors set his salary at $1,000 per month plus a monthly bonus of 25 percent of net profits. The board of directors raised his salary to $1,500 a month in February 1957 and to $2,000 a month *150 in August 1969; however, the percentage for computing the bonus remained unchanged from 1955 through the years at issue. Anselmo Steve Simi was first employed by Good Chevrolet as a commission salesman in September 1964. He was promoted to used car sales manager in May 1965, to general sales manager in June 1966, to vice president and general sales manager in December 1968, and to vice president and general manager in October 1969. On November 1, 1968, Mr. Simi purchased from Mr. Buono 10 percent of the stock of Good Chevrolet for $43,647, and in January 1970, he purchased an additional 15.1 percent of such stock for $70,926.Mr. Simi thus owned 25.1 percent of the outstanding stock of Good Chevrolet during the years at issue. Mr. Simi also has been paid a salary plus bonus since his promotion to used car sales manager in May 1965. Prior to 1968, Mr. Simi's compensation was set by Mr. Buono, as president of Good Chevrolet; thereafter, his compensation was determined by the board of directors. From 1964 through 1969, Mr. Simi's positions and compensation were as follows: Date
Position
Compensation
Monthly
Percent of
Salary
Net Profits
9/8/64
Auto salesman
Commission
5/13/65
Used car sales manager
$ 700
5%
1/1/66
Used car sales manager
700
7%
6/16/66
General sales manager
900
9%
4/1/67
General sales manager
1,000
10%
7/1/68
General sales manager
1,150
10%
11/1/68
General sales manager
1,150
11%
12/23/68
Vice president
1,150
11%
10/1/69
Vice president and
general manager
1,150
17%
*151 In 1971 and 1972, Mr. Simi continued to be paid a salary of $1,150 per month and a bonus of 17 percent of net profits before taxes and other bonuses. As chief executive officer, Mr. Buono was responsible for the overall planning, direction, and control of Good Chevrolet. His duties included: hiring, training, and supervising personnel; maintaining relations with the manufacturer; developing advertising policy and writing and placing advertising copy; and establishing lines of credit and flooring arrangements. In addition, he participated in the Dealers Trade Association, Dealers Planning Committee, and General Motors Dealer Council. As vice president and general manager of Good Chevrolet, Mr. Simi was responsible for most of the day-to-day operations of the corporation including: supervising department heads; making recommendations for promotions, compensation adjustments, and discharges; resolving conflicts among departments; maintaining relations with certain fleet customers; and coordinating the financing, reconditioning, and retailing of fleet buy-backs. The nature of Mr. Buono's duties did not change from the inception of Good Chevrolet in 1955 through the years in issue, *152 and Mr. Simi's duties did not change in nature from his promotion to vice president and general manager in October 1969 through the years at issue; but there were substantial increases in the volume of sales during such years resulting in greatly increased demands upon the two officers. Both Mr. Buono and Mr. Simi devoted substantial time, including many evenings and weekends, to their duties as officers of Good Chevrolet; however, each also had other business interests.During the last 5 months of 1972, Mr. Buono was employed by Good Chevrolet of Renton, Wash. The record does not reveal what his duties were with that corporation nor the amount of his salary, although it is clear that he received some salary from it. During 1971 and 1972, he was also the president and chief executive officer of another company, Good Leasing, although he received no salary from it. During 1972, Mr. Simi was employed as a consultant to Good Leasing, for which he was paid $300 a month during such year. In 1972, Mr. Simi also was employed as a consultant to Good Chevrolet of Renton, Wash., and received $4,000 for his services to such company. In addition to salaries and bonuses, Mr. Buono and Mr. *153 Simi also received deferred compensation in the form of their allocable shares of Good Chevrolet's contribution to its profit-sharing plan. In 1971 and 1972, Good Chevrolet paid Mr. Buono and Mr. Simi the following amounts of current and deferred compensation: [1]
Shareholder-
Profit-Sharing
Officer
Salary
Bonus
Allocation
Total
1971
Mr. Buono
$24,000.00
$ 94,789.00
$13,793.93
$132,582.93
Mr. Simi
13,800.00
63,538.00
8,871.70
86,209.70
$37,800.00
$158,327.00
$22,665.63
$218,792.63
1972
Mr. Buono
$24,000.00
$130,790.00
$15,472.34
$170,262.34
Mr. Simi
13,800.00
92,526.00
9,719.26
116,045.26
$37,800.00
$223,316.00
$25,191.60
$283,307.60
It is customary for automobile dealerships to pay top management employees incentive bonuses based on a percentage of net profits in addition to their basic monthly salaries, regardless of whether such employees own stock in the dealership. In addition to Mr. Buono and Mr. Simi, four other employees of *154 Good Chevrolet were paid monthly salaries plus bonuses based on overall net profits (before taxes and bonuses) in 1971, and five other employees were compensated in such manner in 1972. Incentive bonuses based on departmental (as opposed to overall) net profits were paid to three other employees in 1971 and to four other employees in 1972. All bonuses, both overall and departmental, were computed and paid monthly, based upon monthly financial statements prepared for submission to Chevrolet Motor Division of General Motors (Chevrolet). However, in computing all bonuses, losses in one month were generally carried over and offset against profits in the succeeding months before further bonuses were paid. For the years 1969 through 1972, Good Chevrolet paid the following amounts of current and deferred compensation to its key nonshareholder employees: Profit-Sharing
Position
Salary
Bonus
Allocation
Total
1969
Bonuses Based on
Overall Profits
Used Car Manager
$ 8,400.00
$10,506.78
$ 2,966.96
$21,873.74
Fleet Manager
8,400.00
7,794.00
534.28
16,728.28
Office Manager
11,700.00
8,106.33
3,129.54
22,935.87
New Car Manager
7,700.00
8,052.38
2,396.89
18,149.27
Bonuses Based on
Department Profits
Service Manager
$ 9,600.00
$ 4,386.38
$ 2,077.71
$16,064.09
Fin./Ins. Manager
7,800.00
7,835.91
2,375.83
18,011.74
1970
Bonuses Based on
Overall Profits
Used Car Manager
$ 8,400.00
$14,855.20
$ 3,612.07
$26,867.27
Fleet Manager
8,400.00
7,249.70
2,283.59
17,933.29
Office Manager
11,700.00
11,910.93
3,674.19
27,285.12
New Car Manager
8,400.00
14,717.34
3,587.99
26,705.33
Bonuses Based on
Department Profits
Department Profits
Service Manager
$ 9,600.00
$ 5,801.94
$ 2,240.31
$17,642.25
Fin./Ins. Manager
7,800.00
8,637.61
2,421.22
18,858.83
Body Shop Manager
9,600.00
1,845.28
1,549.19
12,994.47
(began 1970)
1971
Bonuses Based on
Overall Profits
Used Car Manager
$ 8,400.00
$25,850.66
$ 3,755.16
$38,005.82
Fleet Manager
(began 1971)
7,000.00
12,172.00
1,601.51
20,773.51
Office Manager
11,700.00
20,862.00
3,554.64
36,116.64
New Car Manager
8,400.00
25,850.66
3,755.15
38,005.81
Bonuses Based on
Department Profits
Service Manager
$10,600.00
$ 6,242.28
$ 1,687.95
$18,530.23
Fin./Ins. Manager
7,800.00
10,772.33
1,893.39
20,465.72
Body Shop Manager
9,600.00
2,328.40
1,104.44
13,032.84
1972
Bonuses Based on
Overall Profits
General Sales
Manager a
$ 9,134.56
$40,769.70
$ 5,266.79
$55,171.05
Fleet Manager
9,134.56
19,248.39
2,756.48
31,139.43
Office Manager
11,700.00
26,367.00
3,886.05
41,953.05
New Car Manager
(through 7-31)
5,600.00
20,618.00
26,218.00
Used Car Manager a
31,103.00
31,103.00
Bonuses Based on
Department Profits
Service Manager
$11,400.00
$ 6,659.70
$ 1,552.34
$19,612.04
Fin./Ins. Manager
7,800.00
11,317.17
1,675.69
20,792.86
Body Shop Manager
(began 1972)
11,500.00
3,297.65
1,171.84
15,969.49
Body Shop Manager
(died 1972)
200.00
11.02
211.02
*155 Chevrolet assigned a "planning potential" to each of its franchised dealers; the figure assigned to each dealer represents the average number of Chevrolet vehicles sold and registered in the vicinity of the dealer. For the years in issue, Good Chevrolet's planning potential was 1,000 new units per year, consisting of 800 automobiles and 200 trucks. In fact, Good Chevrolet consistently sold more than its planning potential; it sold 2,662 new units in 1971 and 2,931 new units in 1972. For 1971 and 1972, in terms of planning potential, Good Chevrolet ranked approximately 30th out of the 32 dealers in the three Metro Districts in the Bay area consisting of Oakland, San Francisco, and San Jose, Calif. In terms of performance as measured by the number of new units sold, Good Chevrolet was first of the 32 dealers in such districts in both 1971 and 1972, and was one of the top three dealers in the entire Oakland Zone of 140 dealers in both years. The success of Good Chevrolet is shown by the corporation's history of increases in sales, earnings, compensation *156 paid to its officers, net income, taxable income, and taxes paid--all of which are summarized below: Net Income
New
Used
Before
Vehicle
Vehicle
Gross
Buono & Simi
Sales
Sales
Sales
Compensation
(units)
(units)
(dollars)
(dollars)
1972
2,931
1,686
14,089,013
494,922
1971
2,662
1,791
12,919,249
365,410
1970
1,995
1,661
10,199,432
222,396 1969
2,045
1,574
9,740,270
135,957
1968
1,359
1,38 8
7,153,444
159,124
1967
1,325
1,382
6,567,592
119,364
1966
1,234
1,496
6,212,889
136,834
1965
1,129
1,311
5,366,718
117,428
1964
1,060
1,216
4,628,666
144,355
1963
913
1,041
4,042,585
134,537
1962
808
1,050
3,662,861
104,502
1961
612
867
2,693,943
58,527
1960
622
863
2,723,174
11,550
1959
604
838
2,928,648
78,533
1958
546
794
2,718,151
59,384
1957 b
742
862
1,950,286
36,833
1956 c
374
396
2,621,739
104,708
1955 d
441
433
1,578,588
40,288
Buono a
Simi a
Salary &
Salary &
Taxable
Federal
Bonus
Bonus
Income
Taxes
(dollars)
(dollars)
(dollars)
(dollars)
1972
154,790
106,326
233,805
1 02,300
1971
118,789
77,338
169,283
74,685
1970
85,537
55,645
81,214
33,295
1969
67,317
36,949
31,691
9,000
1968
64,568
33,590
60,966
24,773
1967
63,503
55,861
19,509
1966
61,087
75,747
29,794
1965
53,830
63,598 23,296
1964
59,488
84,867
34,594
1963
61,767
72,770
32,230
1962
52,481
52,021
21,426
1961
33,47 1
25,056
7,512
1960
22,986
(11,436)
1959
37,236
41,297
15,974
1958
27,590
31,794
11,032
1957 b
19,429
17,404
5,842
1956 c
35,359
69,349
30,562
1955 d
14,869
25,419
7,718
*157 Good Chevrolet's successful history was due primarily to the development of a high volume fleet business. [2] Mr. Buono devised and successfully implemented a guaranteed buy-back program for large fleet customers, whereby at the end of a 1- or 2-year period, Good Chevrolet repurchased the cars at a price determined at the time of the original sale to the customer. As an additional service to fleet customers, Mr. Buono instituted a program of servicing and repairing the vehicles in the field. The final aspect of the success of the fleet business was the development and implementation of a program to recondition and profitably sell at retail the repurchased vehicles in large volume. For 1971 and 1972, the ratios which the total compensation (current and deferred) paid to the two share-holder-officers bears to the total compensation paid to the other key employees, to gross sales, and to net income and the ratios which the total compensation paid *158 to the other key employees bears to the gross sales and net income are as follows: 1971
1972
1. Officers' compensation
to gross sales
1.69%
2.01%
2. Officer's compensation
to net income
59.88%
57.24%
3.Officers' Compensation.
to compensation of
other key employees
118.31%
116.99%
4. Compensation of other
key employees to
gross sales
1.43%
1.72%
5. Compensation of other
key employees to
net income
50.61%
48.93%
In comparison to four other eastern San Francisco Bay area dealers, Good Chevrolet paid the highest percentage of its gross sales as compensation to its officers. However, officers' compensation generally constituted a lower percentage of Good Chevrolet's net income: Corporation
Corporation
Corporation
Corporation
A
B
C
D
1971
Gross sales
$7,927,996
$3,875,995
$8,867,841
Net income (before
officers' compensation)
122,052
40,670
229,865
Officers' compensation:
70,926
38,894
135,215
a
Chairman of board
64,436
President
25,888
38,894
70,779
Vice president
19,330
Secretary-Treasurer
25,708
Officers' compensation: As a percentage of
net income a
58.1%
95.6%
58.8%
As a percentage of
gross sales a
0.89%
1.00%
1.52%
Taxable income
51,126
1,776
94,650
1972
Gross sales
$9,894,406
$4,372,807
$8,850,494
$5,896,858
Net income (before
officers' compensation)
142,477
51,905
204,834
37,512
Officers' compensation:
82,431
37,820
134,676
58,500
a
Chairman of board
63,901
President
26,575
37,820
70,775
21,082
6,600 b
Vice president
29,460
17,268
Secretary-Treasurer
26,396
13,550
Officer's compensation: As a percentage of
net income a
57.9%
72.9%
65.7%
156.4%
As a percentage of
gross sales a
0.83%
0.86%
1.52%
0.99%
Taxable income
60,046
14,085
70,158
(20,988)
*159 The Chevrolet Oakland Zone Manager and a certified public accountant familiar with the automobile industry both were of the opinion that the compensation paid to Messrs. Buono and Simi was not unreasonable in comparison to that paid by other dealers of similar size in the East Bay area. Despite its profitable history, Good Chevrolet has never paid a dividend. However, in accordance with its Dealers Sales and Service Agreement with Chevrolet, Good Chevrolet periodically entered into Minimum Capital Standard Agreements with Chevrolet; such agreements specified the "minimum owned net working capital" [3] which the dealer was required to maintain. The amount was determined by Chevrolet and was based upon its judgment as to the amount of capital required to properly handle the business to be conducted under the franchise agreement for a 30-day operating period. The Minimum Capital Standard Agreement, in effect on January 1, 1971, required that Good Chevrolet establish owned net working capital of $372,917. *160 Such agreement was amended on September 1, 1971, to require the dealer to establish owned net working capital of $463,409 by no later than May 31, 1972. A subsequent agreement, entered into on April 1, 1972, required owned net working capital of $571,938 to be established by March 31, 1973. The amounts of Good Chevrolet's actual owned net working capital and unappropriated retained earnings were as follows: Date
Working Capital
Retained Earnings
1/1/71
$410,419
$ 406,661
9/1/71
411,455
1/1/72
503,058
495,676
4/1/72
502,839
12/31/72
584,383
613,786
The revenue agent assigned to examine Good Chevrolet's returns for 1971 and 1972 compared the compensation paid to its officers in prior years with that paid during the years at issue and determined that the prior years' compensation was not unreasonably low and that compensation had increased dramatically during the years at issue. He discussed such fact, and the fact that the nature of Mr. Buono's and Mr. Simi's duties apparently had not changed, *161 with Good Chevrolet's in-house accountant. The revenue agent also considered the fact that, despite Good Chevrolet's history of profits, no dividends had ever been paid.However, during the course of his audit, the agent had no discussions with Mr. Buono, Mr. Simi, or the Oakland Zone office of Chevrolet; nor did he attempt to compare Good Chevrolet with other Bay area dealers with a similar volume of sales. In addition, he did not consider Good Chevrolet's planning potential as compared to actual sales, or the owned net working capital which Chevrolet required it to establish. In his notice of deficiency, the Commissioner disallowed as excessive $58,211 of the compensation paid to Good Chevrolet's officers in 1971 and $78,017 of the compensation paid to them in 1972. The notice stated that such amounts constituted dividends and indicated that they were computed by taking 15 percent of the sum of the total compensation (current and deferred) paid to the officers and the net profits reported on the returns. The notice did not indicate how much of the disallowance is allocable to Mr. Buono and how much to Mr. Simi, nor has the Commissioner indicated at any time during these proceedings *162 the amounts he considers to be reasonable compensation for Mr. Buono and Mr. Simi. OPINION At the commencement of the trial in this case, the petitioner moved that the burden of proof be shifted to the Commissioner, arguing as its basis for such motion that the deficiency determination was arbitrary and unreasonable. Counsel for the petitioner called the revenue agent as a witness and, in questioning him, established that he had not inquired into all the factors which the IRS manual indicated should be considered in deciding whether compensation is reasonable. The petitioner argues that because the revenue agent did not inquire into everyfactor enumerated in the IRS manual and in judicial decisions to be considered in deciding whether compensation is reasonable, the Commissioner's determination is arbitrary and without factual foundation. The petitioner asserts that the revenue agent applied an arbitrary and mechanical test to fix a dividend which must be paid in all events before any compensation is paid to owner-officers. The petitioner argues, citing Helvering v. Taylor,293 U.S. 507 (1935), that where the taxpayer demonstrates that the Commissioner's deficiency determination *163 is arbitrary and unreasonable, the taxpayer has met his burden of proof, and that the burden shifts to the Commissioner to demonstrate the correctness of his determination. However, we are not convinced that the determination in this case was arbitrary. The agent's failure to follow all the procedures suggested by the manual is no ground for concluding that the determination was arbitrary. See Montgomery v. Commissioner,65 T.C. 511, 522 (1975); Rosenberg v. Commissioner,450 F. 2d 529, 533 (10th Cir. 1971), affg. a Memorandum Opinion of this Court. Nor are we convinced that his action was arbitrary merely because he failed to consider all the factors which we believe are relevant to the matter at issue. See Roberts v. Commissioner,62 T.C. 834, 837 (1974); Rosenberg v. Commissioner,supra;Estate of Wilson v. Commissioner,2 T.C. 1059, 1086-1087 (1943). Although we reach a different conclusion as to the reasonableness of the compensation than did the agent, he certainly had some grounds to support his conclusion: the dramatic increase in the compensation of the officer-shareholders and the lack of dividends, despite the established success of the business, are sufficient reasons *164 to demonstrate that the determination was not arbitrary. Consequently, we reject the petitioner's motion to shift the burden of proof. Rosenberg v. Commissioner,supra.
The deductibility of the compensation paid to Mr. Buono and Mr. Simi turns on the meaning of section 162(a)(1), which permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." [4] *166 To be deductible, it must be shown that a payment is reasonable and that it is made for services actually rendered. Sec. 1.162-7(a), Income Tax Regs.; Nor-Cal Adjusters v. Commissioner,503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Whether such a showing has been made presents a question of fact to be resolved on the basis of an examination of all of the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner,500 F. 2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F. 2d 603, 605 (9th Cir. 1968), *165 affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). The factors generally considered relevant in determining reasonableness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] See also Commercial Iron Works v. Commissioner,166 F. 2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. at 567-568. No single factor is decisive; rather, we must consider and weigh the totality of the facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,supra.Where officer-shareholders who are in control of a corporation set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Charles Schneider & Co. v. Commissioner,500 F. 2d at 152; Logan Lumber Co. v. Commissioner,365 F. 2d 846, 851 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; Heil Beauty Supplies, Inc. v. Commissioner,199 F. 2d 193, 194 (8th Cir. 1952), affg. a Memorandum Opinion of this Court; Miles-Conley Co. v. Commissioner,173 F. 2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948); Northlich, Stolley, Inc. v. United States,368 F. 2d 272, 278 (Ct. Cl. 1966). *167 In this case, the issue is close: there are a number of factors which suggest that the compensation paid to Mr. Buono and Mr. Simi in 1971 and 1972 was excessive and constituted a distribution of a share of the profits. For example, as the president and vice president and sole shareholders of the petitioner, they controlled its affairs, and a large portion of its net income--approximately 60 percent in 1971 and 57 percent in 1972--was paid to them as compensation. City Chevrolet Co. v. Commissioner,228 F. 2d 894 (4th Cir. 1956), affg. per curiam a Memorandum Opinion of this Court, cert. denied 351 U.S. 939 (1956); Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. at 569-570. In addition, although the nature of their duties did not change from 1969 through 1972, their compensation increased dramatically. Pacific Grains, Inc. v. Commissioner,399 F. 2d at 607. The salary and bonus paid to Mr. Buono in 1972 were more than twice the amount received by him in 1969; during the same period, Mr. Simi's salary and bonus almost tripled. Furthermore, such increases were due in part to fortuitous economic conditions, and not to altered or augmented endeavors by them. Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591-592 (1972). *168 Although the compensation paid to Mr. Buono was established by a long-standing formula, that formula was adopted when the business of the petitioner was significantly different, and there is a question as to whether it was realistic for him to continue to receive such a large share of the profits when those profits were multiplied many-fold. Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra at 568-569; City Chevrolet Co. v. Commissioner,supra;University Chevrolet Co. v. Commissioner,16 T.C. 1452, 1454-1455 (1951), affd. 199 F. 2d 629 (5th Cir. 1952). Also, the compensation paid to the officers in this case, when compared to gross receipts, exceeded that paid to the other dealers in the Bay area with respect to which we have information. Mayson Mfg. Co. v. Commissioner,178 F. 2d at 119. Finally, the petitioner was a well established and highly successful business; nevertheless, no dividends were ever paid to its shareholders. Pacific Grains, Inc. v. Commissioner,399 F. 2d at 607; Dielectric Materials Co. v. Commissioner,57 T.C. at 591. On the other hand, other factors convince us that Mr. Buono's and Mr. Simi's compensation in 1971 and 1972 was reasonable. Here, we *169 have an extraordinarily successful business. In 1971 and 1972, its new car sales were approximately two and one-half times that expected of it by Chevrolet, and its new car sales exceeded those of all other Chevrolet dealers in the Bay area even though, based on the sales expected of it, it ranked thirtieth among such dealers. We were told that 1971 and 1972 were good years for new car sales, but the comparative success of the petitioner shows clearly that the volume of its new car sales was not due solely to general economic conditions but must be attributed to the efforts of its employees. Mr. Buono and Mr. Simi were astute, aggressive, and hardworking businessmen, and the petitioner's success appears to be due to their efforts. Much of that success is due to their development and implementation of the program to increase fleet sales. Employees responsible for successes of this extraordinary magnitude deserve to be highly compensated for their efforts. Edwin's, Inc. v. United States,501 F. 2d 675, 677 (7th Cir. 1974); Levenson & Klein, Inc. v. Commissioner,67 T.C. at 713. What is more, experts familiar with the automobile business in the Bay area found the compensation paid *170 to Mr. Buono and Mr. Simi to be in line with the compensation paid to officers of other dealerships even though those dealers were less successful than the petitioner. Logan Lumber Co. v. Commissioner,365 F. 2d at 851; Mayson Mfg. Co. v. Commissioner,178 F. 2d at 121; see sec. 1.162-7(b)(3), Income Tax Regs.
Though the officers were also shareholders of the petitioner, they are entitled to reasonable compensation for services actually rendered. Commercial Iron Works v. Commissioner,166 F. 2d at 224; see Levenson & Klein, Inc. v. Commissioner,67 T.C. at 713. In the automobile dealership business, it is customary to compensate officers and other key employees by paying them relatively modest salaries together with a bonus based on the profits of the business. In this case, the percentage of profits paid to Mr. Buono was determined at a time when he did not control the business, and although he subsequently acquired control, he did not alter that percentage. In like manner, the percentage paid to Mr. Simi was decided on by a board of directors not controlled by him. Moreover, the other key employees of the petitioner, even though they owned none of its stock, also received bonuses *171 based upon its profits. It is true that the bonuses paid to the other employees represented a smaller percentage of the profits, but those employees had lesser responsibilities. Although the bonuses received by Mr. Buono and Mr. Simi in 1971 and 1972 were large, the ratio which their bonuses in those years bear to those in the earlier years is approximately the same as the similar ratio for some of the other key employees. The regulations recognize that amounts paid pursuant to a plan of contingent compensation may be deductible, even though such amounts may be greater than what would ordinarily be paid. Sec. 1.162-7(b)(2), Income Tax Regs. In addition, the use of such a formula can result in lesser compensation in less successful years; for example, in 1959, Mr. Buono's salary and bonus totaled $37,236, whereas in 1960, he received only $22,986. Furthermore, though the bonuses received by the officers in this case constituted a higher percentage of gross sales than the similar compensation paid to the officers of other dealers in the East Bay area, the compensation of Mr. Buono and Mr. Simi generally constituted a smaller percentage of the net income of the petitioner than was *172 received by the officers of the other dealers. Mayson Mfg. Co. v. Commissioner,178 F. 2d at 119. Finally, this is not a case in which the controlling officers annually draw all, or virtually all, of the profits of the business in the form of bonuses. Compare Boyle Fuel Co. v. Commissioner,53 T.C. 162, 171 (1969); Klamath Medical Service Bureau v. Commissioner,29 T.C. at 348-349. In this case, the bonuses were computed by a predetermined formula; substantial taxable income remained after the payment of bonuses; and substantial taxes were paid by the petitioner. In an established and successful business such as the petitioner's, the shareholders are entitled to share in that success in some manner, and the failure to pay dividends raises a question as to whether the distributions were for services actually rendered. Charles Schneider & Co. v. Commissioner,500 F. 2d at 153; Pacific Grains, Inc. v. Commissioner,399 F. 2d at 607; Miles-Conley Co., Inc. v. Commissioner,173 F. 2d at 960; Dielectric Materials Co. v. Commissioner,57 T.C. at 591. However, the petitioner had substantial retained earnings, and it was required by Chevrolet to maintain a substantial owned net working capital *173 account. At the beginning of 1971, there was slightly over $400,000 in that account; during 1971, almost $100,000 was added to it, and in 1972, approximately $80,000 was added to it. The retention of earnings and the accumulation of capital in that account were required by Chevrolet. Had it not been for such requirement, additional amounts could have been paid out in some manner. The retention of such amounts in the capital account will ordinarily enhance the value of the holdings of the shareholders. Thus, the failure to pay dividends is adequately explained by the necessary additions to the working capital account. After weighing all the facts and circumstances, it is our judgment that the compensation paid to the officers in this case was reasonable, and we hold that such payments are deductible under section 162(a)(1). Decision will be entered for the petitioner. Footnotes
1. The joint exhibits submitted by the parties were inconsistent as to the amounts paid in 1972; we have used the total amounts of compensation set forth on the tax return for that year and computed the bonuses by subtracting the salary payments and profit-sharing allocations from such totals.↩
a. The individual who had been Used Car Manager became General Sales Manager in 1972, and another individual became Used Car Manager.↩
b. For the period 6-1-57 to 12-31-57.↩
c. For the period 6-1-56 to 5-31-57. ↩
d. For the period 10-10-55 to 5-31-56.↩
a. Does not include profit-sharing allocation. ↩
2. Fleet customers are those who annually or biannually buy a large number (fleet) of new cars.↩
a. Does not include profit-sharing allocation. ↩
b. The parties stipulated that such payment was made to one of the officers of this corporation, but they did not indicate who received it.↩
3. In computing a dealer's actual owned net working capital for purposes of the agreement, all current asset reserves and all↩ liabilities (including long-term liabilities) were deducted from total current assets.
4. Profit-sharing contributions are deductible under sec. 404(a), I.R.C. 1954, but only to the extent that any contribution for the benefit of an employee, together with other compensation for such employee's services, constitutes a reasonable allowance for services rendered. Sec. 1.404(a)-1(b), Income Tax Regs.↩